**UNITED STATES**

v.

**Timothy J. ELLIS, Sr., Aviation Electronics Technician Second Class (E–5), U.S. Navy.**

**NMCM 98 00729.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 21 April 1997.

Decided 11 May 2001.

LCDR Robert C. Klant, JAGC, USN, Appellate Defense Counsel.

LT Kevin S. Rosenberg, JAGC, USNR, Appellate Government Counsel.

Before LEO, Chief Judge, ANDERSON, Senior Judge, and NAUGLE, Appellate Military Judge.

LEO, Chief Judge:

Contrary to his pleas, the appellant was convicted at a general court-martial before officer and enlisted members of involuntary manslaughter and assault consummated by a battery upon a child under the age of sixteen years, in violation of Articles 119 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 919 and 928. He was awarded a bad-conduct discharge, confinement for six years, forfeiture of all pay and allowances, and reduction to pay grade E–1. The convening authority approved the sentence as adjudged.

We have examined the record of trial, the assignments of error, and the Government's response. The findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the accused was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

## I. Involuntary Confession

The appellant contends that his confession was obtained and admitted, over defense objection, in violation of his rights under the Fifth Amendment to the Constitution of the United States; Article 31(d), UCMJ, 10 U.S.C. § 831(d); and Military Rule of Evidence 304, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). According to the appellant, "the threat [by state authorities] to arrest [him] and his wife and remove the couple's children to foster care and the subsequent use of [his] wife to plead with him to confess rendered [his] purported confession involuntary." Appellant's Brief of 12 Jul 1999 at 24.

### A. Facts

On 4 June 1994, Timothy Ellis, Jr. [Timmy], the appellant's two-and-a-half-year-old son from a previous marriage, was brought unconscious to the emergency room at the Naval Hospital in Jacksonville, Florida, by the appellant's wife. Due to the seriousness of his condition, the child was immediately transferred to the University of Florida Medical Center in Jacksonville, where he died four days later. At the autopsy, the attending medical examiner concluded that Timmy had died as a result of severe swelling of the brain from blunt trauma to the head.

Following Timmy's death, Detective Hickson, the lead investigator in the case, arranged for a meeting with the appellant and his wife on 10 June 1994, in the offices of the Jacksonville Sheriff's Department to discuss the events leading up to the death. At the time, Detective Hickson did not know whether the appellant and his wife should be treated as suspects in Timmy's death. However, based upon the initial autopsy findings from the County Medical Examiner's Office, he suspected the death was a homicide resulting from child abuse. When the couple arrived at approximately 1100, they were interviewed

separately. While they were there, the appellant and his wife were not free to move about the office area alone; each had to be escorted, for example, to use the restroom. However, neither of them were handcuffed or locked in a room, nor were they explicitly told that they could not leave.

After determining from the initial interviews that Timmy was in the sole care of the appellant and his wife prior to his admission to the hospital and that neither of them could provide a satisfactory explanation for the child's fatal injury, Detective Hickson decided to advance his inquiry with separate accusatory interrogations of the couple. They were given *Miranda* warnings advising them that they were suspected of criminal child abuse. Both of them elected to waive their right to remain silent and their right to counsel. In the course of the interrogations, Detective Hickson informed each of them that he believed there was probable cause to arrest both of them for child abuse. He also indicated that, if both of them were arrested, their other six children would probably be removed from their home by officials from the Department of Human and Rehabilitative Services [HRS] and temporarily placed in foster care. The appellant's wife, who was interrogated first, denied any knowledge or involvement in Timmy's death and asked to speak to the appellant. However, her request was not honored until after the appellant was interrogated. During his interrogation, the appellant also denied any knowledge as to how his son sustained the fatal brain injury. His interview was relatively short, lasting only about 25 minutes. Afterwards, Detective Hickson consulted with his colleagues, Detective Robinson and Sergeant Japour, and decided to allow the appellant to meet with his wife, as she had requested, in the hope that their meeting would lead to the disclosure of additional information. After the couple met privately for approximately 15 minutes, the appellant came out of the room and indicated to Detective Robinson that he wanted to talk.

The appellant admitted to the detective that, on 2 June 1994, he struck Timmy in the face and then grabbed the child's head and pounded it on the shower floor several times after Timmy defecated in his pants and started playing with the feces. Detective Robinson left the room and returned with Sergeant Japour. The appellant was advised that his admission was inconsistent with the medical evidence pointing to a more recent injury. The appellant then admitted that he had also assaulted Timmy on 4 June 1994. He stated that he became very angry because the child would not eat his breakfast and was picking again at a sore inside his lip. So, he stood the child on a small picnic table in the family garage and struck him with sufficient force to knock him to the ground. The appellant then grabbed the child by the head and pounded it several times against the cement floor. A court reporter was then summoned to transcribe, as well as tape, the appellant's confession. The interrogation finally concluded at 2010 on 10 June 1994. *See* Appellate Exhibit CL. By that time, the appellant had spent a total of approximately three hours and twenty minutes in the actual company of the detectives that day (including the initial interview, the two interrogations, and the recording of the confession). Appellate Exhibit LX at 15 (military judge's finding of fact [FF] # 73).

At trial, the appellant moved to suppress his confession on the grounds that it was involuntary, having been wrongfully obtained through coercion, unlawful influence, and unlawful inducement. As the party with the burden of proof, the Government called the detectives who were involved in the interrogations, as well as the investigator from the county medical examiner's office and the court reporter who taped and transcribed the appellant's confession. The appellant provided copies of his transcribed testimony, as well as those of the detectives and the appellant's wife, from his first trial in the Circuit Court of Duval County, Florida;[1] he also

---

1. The appellant was initially tried by local authorities in Florida for the death of his son. However, he successfully moved at trial to suppress his confession, causing the authorities to cease prosecution of the case. Although the trial

judge in the state court proceeding found the appellant's confession to be involuntary, this finding was not binding on the trial court below since the United States was not a party to the

provided the pretrial depositions of his wife, the detectives, and the investigator that were taken prior to the state court proceeding. *See* Appellate Exhibits XII(b) through XII(f).

The testimony of the appellant and his wife in the earlier state court proceedings conflicted sharply with the testimony of the Government witnesses concerning the circumstances surrounding their interrogations. The couple claimed that the lead interrogator, Detective Hickson, had engaged in rude and aggressive behavior during their interrogations in an attempt to intimidate them into confessing. Hickson and Robinson, the other detective present at the initial accusatory interrogations, denied the allegations. In his findings of fact, the military judge found that Detective Hickson did inform the couple during their respective interrogations that he had probable cause to arrest both of them for Timmy's death and that, if they were arrested, their other children would be taken by HRS and placed in foster homes. Appellate Exhibit LX at 9–11 (FF # 34d and FF # 42); *see also* Record at 136 and 141. However, he concluded that the detectives had not used unlawfully coercive tactics against the couple. Appellate Exhibit LX at 9–10 (FF # 35 and FF # 41).

During cross-examination, Detective Hickson explained why he had advised the appellant and his wife that he had probable cause to arrest them and that HRS would come and take their children:

Q. Now you testified previously that the reason that you told them this was because it was an accurate statement of what would happen, is that right?

A. Yes, sir, that's correct.

. . . .

Q. And weren't you hoping that by giving—weren't all of your actions designed to try to get these people to cooperate with you and tell you what you were trying to find out?

A. That's correct.

Q. And wasn't your relating to Mrs. Ellis what would happen to her children in the event they were both arrested, wasn't that, in fact, something that

you hoped would get her to tell you what you needed to know?

A. It was a twofold meaning, yes. What you're saying is true, and also it was a statement of fact.

Q. So it was a statement of fact, and the motivation for relating that fact would be that you hoped it would get her to come clean with you?

A. To tell the truth, yes, sir.

Q. Okay. Because if she had continued, if both of these folks in your mind had continued to maintain the story they were giving at that point, they both would have been arrested, would they not?

A. Probably.

Q. And then if both of them had been arrested, their children would have been taken by HRS, wouldn't they?

A. Yes, sir.

Q. And that's what you were trying to get across to Mrs. Ellis, is that right?

A. As I said, it was a twofold meaning to it, so I guess you're right.

Q. And would that same line of reasoning then apply to your second interview with Mr.—with AT2 Ellis, when you told him about HRS as well?

A. Yes, sir, I believe it would.

Q. That you—that it was a statement of fact, but it was also designed to push him towards cooperating with you, to tell you what happened, is that right?

A. Yes, sir, to tell the truth.

Q. Okay. But because what he told you up—what he had told you up to that point, you didn't believe?

A. No, sir.

Record at 159–60.

The appellant did not testify on the suppression motion at his court-martial. Instead, his transcribed testimony from the state court proceeding was offered. In it, the appellant described his mental state, first, when he was advised that he and his spouse could be arrested for Timmy's death and, later, when he was finally allowed to see

state court proceeding. *United States v. Garries,* 22 M.J. 288, 292 (C.M.A.1986).

his wife again after the initial accusatory interrogations:

Q. Okay. Did the detective ever say anything about arresting you or Laurie?

A. He said that we could both be arrested, he's got enough to arrest us both and have the kids taken away from us.

Q. Okay. What did he say about the kids being taken away?

A. He said that if we were arrested that HRS would take them and put them in foster homes.

. . . .

Q. Mr. Ellis, how many children were in your household at that time?

A. At that time there was six.

Q. Okay. And some of these children are not your biological children, is that right?

A. Biologically speaking, four of them were not mine, but as I consider them, they were all mine.

. . . .

Q. Okay. Did you feel protective of all the children?

A. Yes.

. . . .

Q. How did it affect you when the detective told you that HRS might take the children?

A. I was scared. I was scared for them. I was very upset. I knew that the older boys had had a rough experience with their—with their father and I knew that it would be really rough on them to be torn away from their mother because they were a real test of her and not me.

Q. Okay. Were you at all concerned about Laurie's well-being?

A. Very much, because her kids were, from the time she was having problems with her first—with her ex-husband and the time I come in the picture, those kids were her rock. They held her together, I guess, a little bit. She loved them and she would have done anything for them.

Q. Were you at all concerned about the consequences Laurie might suffer if she herself was put in jail?

A. Yes I was. I just could not see a jail here no place for her to go to be, especially now that she's been diagnosed with Lupus, so it just wouldn't be good.

Q. All right. Mr. Ellis, did you feel that Detective Hickson had the ability to have your children taken away?

A. Very much. I was convinced when he said it if he could do it, he would do it.

. . . .

Q. Okay. Now, when the—after the detective left, at this point were you eventually taken to the room Laurie was in?

A. Yes.

Q. Okay. And when you got there, what was Laurie's emotional state like?

A. She was a mess. She had been crying, she was hysterical, very upset. When I come in the door and they had left, she just started rambling on how they were threatening to take the kids away, how we couldn't let them do that, how—just—

Q. How did that affect you, Mr. Ellis?

A. It upset me a lot. I was—the whole thing—this whole thing with the police department, it scared the hell out of me. I had never been through anything like this in my life. I didn't know what was going on. I never expected in my life the police to threaten you or say they were going to do this or do that and to see my wife in a mess like that, it tore me up inside. I couldn't take it. I just couldn't take it no more.

Q. And what did you decide to do?

A. They wanted—they wanted one of us to confess to doing that to Timmy and I just—I had to do something. I had to say something because I did not want them to arrest my wife and take my kids away.

Appellate Exhibit XII(b) at 153–58.

Q. Mr. Ellis, were the statements that you made about events happening on

Tuesday and the statement you made about events happening on Saturday, were those the results of the police threatening to have HRS take the children?

A. Yes.

*Id.* at 160.

After considering all of the evidence, the military judge ruled that the Government had sustained its burden of proof as to the voluntariness of the appellant's confession and denied the motion to suppress its admission into evidence. Appellate Exhibit LX at 21. He concluded that Hickson's statement, particularly about the removal of the couple's other children to foster homes, did not constitute a threat or a *quid pro quo* promise; it was simply "an adjuration to speak the truth." *Id.* at 17 and 19.

## B. Law

■ The Fifth Amendment provides: "No person ... shall be compelled in any criminal case to be a witness against himself nor be deprived of life, liberty, or property without due process of law...."[2] Accordingly, a confession must be voluntary before it can be admitted into evidence. *Dickerson*, 530 U.S. at 433, 120 S.Ct. 2326. Congress expressly incorporated these rights into the UCMJ, which states that "[n]o person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him," Art. 31(a), UCMJ, and that "[n]o statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial." Art. 31(d), UCMJ. The President, in turn, implemented these constitutional and statutory mandates in Mil.

R. Evid. 304(a), which states, in pertinent part, that "an involuntary statement or any derivative evidence therefrom may not be received in evidence against an accused who made the statement if the accused makes a timely motion to suppress or an objection to the evidence under this rule," and Mil. R. Evid. 304(c)(3), which defines an involuntary statement as one "obtained in violation of the self-incrimination privilege or due process clause of the Fifth Amendment to the Constitution of the United States, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement."

In *United States v. Bubonics*, 40 M.J. 734, 739 (N.M.C.M.R.1994), *aff'd* 45 M.J. 93 (1996), this court stated that "[t]he principles for determining whether a pretrial statement was the product of coercion, unlawful influence, or unlawful inducement are essentially the same whether the challenge is based on the Constitution, Article 31(d), or Mil. R. Evid. 304."[3] A confession is voluntary if it is "the product of an essentially free and unconstrained choice of its maker." *United States v. Ford*, 51 M.J. 445, 451 (1999)(quoting *Bubonics*, 45 M.J. at 95). "[I]f his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *Ford*, 51 M.J. at 451 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)).

■ When an accused objects at trial to the admission of his confession, the Government must prove by a preponderance of the evidence that the confession was voluntary. *Bubonics*, 45 M.J. at 95; MIL. R. EVID. 304(e). This determination is made by examining "the totality of all the surrounding circumstances" of the confession, including "both the characteristics of the accused and

---

**2.** The rule against admitting coerced confessions is grounded not only in the right against self-incrimination, but in notions of due process. *Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). *See also United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (stating that "substantive due process" prevents government from engaging in conduct that "shocks the conscience," or interferes with rights "implicit in the concept of ordered liberty.")

**3.** In his findings of fact and conclusions of law, the military judge ruled erroneously that Article 31, UCMJ, and Mil. R. Evid. 304 were inapplicable to the appellant's case because the confession was obtained solely by civil, and not military, authorities. Appellate Exhibit LX at 16. The legislative history of Article 31, UCMJ, clearly established Congress' intent to extend subdivision (d) to confessions "obtained from a person by coercion by *civil authorities*." S.REP. No. 486, at 16 (1950), *reprinted in* 1950 U.S.C.C.S (81st Cong.2d Sess.) 2239–40 (emphasis added).

the details of the interrogation." *Ford,* 51 M.J. at 451 (quoting *Schneckloth v. Busta-monte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)); *United States v. Martinez,* 38 M.J. 82, 86 (C.M.A.1993); *United States v. Jones,* 34 M.J. 899, 906 (N.M.C.M.R.1992). Factors to be considered include the following: the provision of rights warnings; the length of the interrogation; the characteristics of the individual, including age and education; and the nature of the police conduct, including the use of threats, physical abuse, and incommunicado detention. *United States v. Sojfer,* 47 M.J. 425, 429–30 (1998). However, the " '[t]otality of the circumstances' does not connote a cold and sterile list of isolated facts; rather, it anticipates a holistic assessment of human interaction." *Martinez,* 38 M.J. at 87.

■ On appeal, the voluntariness of a confession is a question of law that we review *de novo. Arizona v. Fulminante,* 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Ford,* 51 M.J. at 451. Although the military judge made essential findings of fact in ruling on the appellant's suppression motion, we are not bound by his findings under our Article 66(c), UCMJ, review authority. *United States v. Cole,* 31 M.J. 270, 272 (C.M.A.1990). However, we are generally inclined to give such findings deference, so long as they are adequately supported by the evidence of record. *Jones,* 34 M.J. at 905; *United States v. Ruhling,* 28 M.J. 586, 592 (N.M.C.M.R.1988).

### C. Discussion

■ The Supreme Court recognized that the line between voluntary and involuntary confessions can blur because custodial police interrogations, by their very nature, are inherently coercive; they isolate an individual and trade upon his weaknesses. *Dickerson,* 530 U.S. at 435, 120 S.Ct. 2326 (citing *Miranda v. Arizona,* 384 U.S. 436, 439, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). This reason, among others, led the Court in *Miranda* to craft "concrete constitutional guidelines" known as *Miranda* warnings that the police must follow before interrogating an accused. *Id.* (quoting *Miranda,* 384 U.S. at 442, 86

S.Ct. 1602). However, the mere fact that *Miranda* warnings have been given does not dispense with the need for a voluntariness inquiry, if the admission of a confession at trial is challenged by an accused. *Id.* at 444, 86 S.Ct. 1602.

■ The Supreme Court's described the decision in *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936), as its "seminal confession case," *Colorado v. Connelly,* 479 U.S. 157, 163, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), and the "wellspring" of the notion that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned" as unconstitutional. *Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). In *Brown,* the police brutally extracted the accused's confession by means of physical and psychological torture. The Court held that a conviction cannot stand when the methods applied by the authorities are "revolting to the sense of justice." *Brown,* 297 U.S. at 286, 56 S.Ct. 461. In *Connelly,* the Court stated that its cases since *Brown* "have focused upon the crucial element of police overreaching," *Connelly,* 479 U.S. at 163, 107 S.Ct. 515, and added that, "[w]hile each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a *substantial element* of coercive police conduct." *Id.* (emphasis added). *See e.g., Culombe,* 367 U.S. at 621, 81 S.Ct. 1860 (holding that the confession of an illiterate, mentally impaired accused was coerced, even though there was no physical maltreatment, after police kept him isolated in their custody, systematically subjected him to questioning over several days, enlisted his spouse to pressure him into confessing, failed to act on his request for counsel, and failed to advise him of his constitutional rights). In *Bubonics,* we set aside the accused's conviction after finding that the psychological manipulation employed against him by the master-at-arms interrogators was sufficient to place the voluntariness of his confession in doubt.[4]

4. A confession that is "the product of coercion, *either physical or psychological,* cannot stand."

*Bubonics,* 40 M.J. at 741. He had been subjected to an interrogation technique commonly known as the "good-guy/bad-guy" routine. It included a threat to deprive him of his liberty and turn him over to civilian authorities for prosecution, if he did not confess. Although the accused initially denied culpability, the use of this technique over the course of the interrogation in order to confuse and intimidate him eventually overcame his will to resist and resulted in his confession. *Id.* at 737.

Although Detective Hickson did not resort to the crude devices employed in *Brown* and *Bubonics* to obtain the appellant's confession, he did attempt to exploit a vulnerability common to most people, to wit: the strong emotional ties that individuals generally have with close relatives, particularly spouses and children. Courts in the past have often viewed such tactics with disfavor and overturned convictions in some cases. Perhaps the most notable case of this type is *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). The accused in that case confessed shortly after she had been apprehended at her apartment for selling marijuana to a police informant. During the questioning inside her apartment, the police officers told the accused that the state financial aid she was receiving for her young children would stop and that she would lose custody of her children unless she cooperated with them. The accused had not been advised of her rights, had no prior experience with the law, and had no reason to believe that the police could not carry out their threats. Under these circumstances, the Supreme Court held that her confession was "not voluntary, but coerced." *Id.* at 534, 83 S.Ct. 917. *See also United States v. Tingle,* 658 F.2d 1332 (9th Cir.1981)(holding that accused's confession was involuntary, even though she was advised of her rights, due to investigator's threat that she would be imprisoned and would not see her two-year old child for a long time unless she cooperated); [5] *United States v. Borodzik,* 21 C.M.A. 95, 44 C.M.R. 149, 1971 WL 12473 (1971)(holding that an accused's surrender of stolen property was an involuntary "verbal act" when the government agent influenced the accused's wife to have him cooperate after the accused had asserted his right to counsel); [6] *Askew,* 14 C.M.A. at 264, 34 C.M.R. at 43 (reversing conviction due to insufficiency of members' instructions because military investigator's threat to have civilian police question the accused's wife placed in issue the voluntariness of the confession, even though the accused had been properly warned); [7] *People v. Rand,* 202 Cal.App.2d 668, 21 Cal.Rptr. 89 (1962)(reversing conviction because voluntariness of accused's confession was called into question after police told accused that, if they could not identify the ownership of the marijuana cigarettes that were found in the house, both accused and his wife would be taken to jail and their children turned over to juvenile authorities); *Hall v. State,* 255 Ind. 606, 266 N.E.2d 16 (1971) (holding that accused's confession was not voluntary because it was produced by threats from the police that, if he did not confess to the charge of burglary, his wife would be charged and arrested and his small children handed over to the care of others).

*United States v. Askew,* 14 C.M.A. 257, 34 C.M.R. 37, 42, 1963 WL 4753 (1963)(quoting *Rogers v. Richmond,* 365 U.S. 534, 540, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961))(emphasis included).

5. In remanding the case, the court in *Tingle* specifically noted:

> The relationship between parent and child embodies a primordial and fundamental value of our society. When law enforcement officers prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit "cooperation," they exert the "improper influence" proscribed by [*Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)].

*Tingle,* 658 F.2d at 1336. As a result, the court found that the government agent's ploy of preying upon the accused's maternal fear for her young child was "patently coercive." *Id.*

6. "In a custodial situation, *pressures on an accused's family* are just as likely to cause abandonment of rights as are direct questions of the accused." *Borodzik,* 44 C.M.R. at 151 (emphasis added).

7. "Confessions, when motivated by promises to leave one's wife alone, are simply not the product of a free and unfettered choice between speaking and remaining silent." *Askew,* 14 C.M.A. at 263, 34 C.M.R. at 43.

In reviewing the voluntariness issue under the "totality of the circumstances" standard, the more recent decisions of the military appellate courts have tended to hold that a confession motivated by an accused's concern for the welfare of a family member is not *per se* involuntary, so long as the government agents have acted in good faith and have not engaged in unlawful or excessive conduct. For example, in *United States v. Moreno,* 36 M.J. 107 (C.M.A.1992), our superior court held that the accused's confession to a state social worker investigating an allegation of child sexual abuse was voluntary. Even though the social worker had urged the accused to acknowledge his abuse as a way of initiating a treatment and therapy plan for his family, the court found that her actions did not constitute an improper threat, inducement, or promise. The accused's dilemma—making an admission in order to obtain assistance for his family or remaining silent in order to protect himself from potential criminal liability—was simply the inevitable consequence of parallel governmental processes that are triggered whenever an incident of child abuse is reported. The court found that the social worker had "merely apprised" the accused of "where he stood in the great flow of things" and, "in the best of faith," offered him an option to improve the prospects of help for both him and his family. *Id.* at 112.

In *United States v. Murray,* 45 M.J. 554 (N.M.Ct.Crim.App.1996), this court extended the *Moreno* analysis to an interrogation conducted by a Naval criminal investigator in which the accused confessed to an assault upon a foster child under his care. The investigator admitted advising the accused that the child's severe injuries had occurred while she was under the care of the accused and his pregnant wife and that, if he did not do it, his wife could be charged in state court. *Id.* at 555. We held that the agent's "honest assessment" of the couple's culpability, "without threat of unlawful action," was not a basis to suppress "an otherwise lawful confession." *Id.* at 557.

In *United States v. Vandewoestyne,* 41 M.J. 587 (A.F.Ct.Crim.App.1994), the Air Force appellate court held that the accused's confession to Air Force investigators was knowing and voluntary, even though he confessed out of fear that his failure to cooperate might lead to the deportation of his wife, a resident alien, for her complicity in the offenses of which he was suspected. The appellate court's findings of fact included the following:

> One of the agents speculated that appellant's wife had falsified the endorsement "paid in full" on the receipt. The agent said he knew she was a resident alien and that if she were involved in defrauding the United States, she could be deported. Almost immediately thereafter, appellant admitted the claim was fraudulent.

*Id.* at 591. The court stated that the agents "did little more than express what [the] appellant must have known to be true." *Id.* They made no threats to refer the case to the United States Immigration and Naturalization Service, nor did they promise not to do so if he confessed. Accordingly, the court held that the accused's desire to protect his wife did not render his confession involuntary.

In other jurisdictions, the outcomes have been similar. *See e.g., United States v. Jackson,* 918 F.2d 236, 242 (1st Cir.1990)(holding that suspect's will was not overborne when he admitted ownership of the bag in which cocaine and gun were found, despite claim that his admission was prompted by arrest of his sister for a firearm violation); *United States v. Mullens,* 536 F.2d 997, 1000 (2d Cir.1976)(holding that accused's confession to counterfeiting was not coerced simply because it was prompted by his desire to exonerate his parents, who were arrested in the apartment where the counterfeit bills were found); *Allen v. McCotter,* 804 F.2d 1362, 1364 (5th Cir.1986)(holding that robbery suspect's "desire to extricate his wife from possible good faith arrest" for aiding the commission of the robbery did not render his confession involuntary); *Johnson v. Trigg,* 28 F.3d 639, 644 (7th Cir.1994)(assuming confession by 14–year–old robbery suspect was due to mother's arrest, it was not involuntary "so long as the arrest was bona fide and not a pretext intended to extract a confession"); *Commonwealth v. Raymond,* 424 Mass. 382,

676 N.E.2d 824, 834 (1997)(holding that murder suspect's desire to protect his mother after police suggested she might be charged as an accessory for her role in the cover up did not make his confession involuntary); *Commonwealth v. Berg*, 37 Mass.App.Ct. 200, 638 N.E.2d 1367, 1371 (1994) (holding that confession by drug suspect was not involuntary because he sought to protect his mother from arrest when there was probable cause to apprehend both of them for cocaine found in suspect's apartment).

As we discuss below, there were aspects of the official conduct surrounding the appellant's confession that undoubtedly contributed to his decision to confess. However, the existence of "a causal connection" does not lead us automatically to conclude that there has been a due process violation. *Connelly*, 479 U.S. at 164 n. 2, 107 S.Ct. 515. Otherwise, "no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind." *Bustamonte*, 412 U.S. at 224, 93 S.Ct. 2041 (internal citation and quotes omitted). The critical determinant is whether the confession was "the product of an *essentially* free and unconstrained choice of its maker." *Culombe*, 367 U.S. at 602, 81 S.Ct. 1860 (emphasis added). We, therefore, examine the "totality of the circumstances [surrounding the confession], *including* any promises or threats made by police officers or the prosecution, in order to see whether the will of the [appellant] was overborne." *Jackson*, 918 F.2d at 242. Although the facts in the preceding cases that we have cited are not identical, they do have similarities in varying degrees that are instructive in applying the "totality of circumstances" test to this case. Indeed, our superior court has stated that "only a close, relevant comparison of situations can evolve standards which are solidly and effectively enforceable." *Askew*, 14 C.M.A. at 262, 34 C.M.R. at 42.

In this case, we have a situation involving a good faith declaration by Detective Hickson

that he had probable cause to arrest the appellant and his wife, coupled with an implied threat that HRS would remove their other children if they were arrested.[8] At the time, the appellant was a 27–year–old petty officer with approximately nine years of Naval service. Other than a minor arrest following a domestic altercation with his ex-wife, he had no significant experience with law enforcement authorities before the day of his interrogation. He was of at least average intelligence and had post-high school vocational and military training. There is no evidence that he suffered from any physical or psychological handicaps affecting his comprehension or decision-making abilities. The appellant was not formally in custody at the time he confessed and was not subjected to prolonged interrogations or any physical or psychological abuse by the detectives. In fact, it appears that they were appropriately solicitous of any need he might have for rest or comfort breaks. Finally, the appellant was informed of his *Miranda* rights, and he has not asserted that his waiver of the right to remain silent and the right to counsel were in any way unknowing or involuntary.

The appellant and his wife had gone to the Sheriff's Department offices on 10 June 1994, unaware that Detective Hickson already believed Timmy's death to be a homicide.[9] Therefore, they may have been unprepared for the accusations of culpability that followed the initial interviews. Shortly after they arrived, the appellant was separated from his wife, interviewed by Detective Hickson, and then isolated for some period of time in a controlled area inside the building. He was later subjected to a custodial-type interrogation by Hickson. The record suggests that the tone of this interrogation was relatively restrained. The Supreme Court has noted, nonetheless, that custodial police interrogations, by their very nature, tend to be coercive, even without the use of pressure tactics. *Dickerson*, 530 U.S. at 435, 120 S.Ct.

---

8. The military judge's conclusion that the reference to HRS was simply "an adjuration to speak the truth," Appellate Exhibit LX at 17 and 19, overlooks a different interpretation that is readily apparent and equally plausible. Detective Hickson's comment could reasonably be construed to imply that, if he obtained additional information

clearing either the appellant or his wife as a suspect, the other children would probably not be removed from their home.

9. *See* Record at 157.

2326. Therefore, an interrogation in such a setting could be unsettling and intimidating to someone having limited experience with law enforcement authorities. Finally, Detective Hickson admitted that his comments to the appellant and his wife about having probable cause to arrest them and the resulting possibility of foster care for their other children were calculated to pressure them into providing additional information as to the cause of Timmy's fatal brain injury.

While Detective Hickson's comments may have been truthful, we believe his reference to foster care intervention by HRS, in particular, can be reasonably construed as an implied threat directed at the couple's other children, who were not involved in his criminal investigation. However, he made only a single reference to HRS in each of the interrogations, thereby showing that he was not attempting to magnify or dwell excessively on it. *See* Record at 138 and 142. The appellant, in turn, was obviously not moved to confess because he continued to maintain his innocence throughout this interrogation session. It was only after he met with his wife privately that he decided to confess.

The emotionalism of the appellant's wife when he saw her undoubtedly affected "the state of the [appellant's] mind" and was a factor that we weighed in assessing the voluntariness of his confession.[10] *Bustamonte,* 412 U.S. at 226–27, 93 S.Ct. 2041. The appellant was now squarely faced with a dilemma of his own making in which he had to choose between himself and his family. His decision to confess was motivated largely by her appeal for him to do something about their predicament. Accordingly, the comments that Detective Hickson made to the appellant during the accusatory interrogation were not the primary cause or the motivating factor for the confession.

The appellant argues, however, that the detectives unduly influenced his wife to make him confess. We do not believe this argument is borne out by the facts. First of all,

it was the appellant's wife who initiated the request to speak to him. Unlike the spouse in *Culombe,*[11] she was not importuned by the detectives to have the appellant confess. In fact, they did not know at the time which of the couple might have caused the child's death. Thus, we find nothing improper about their decision to allow the appellant and his wife to meet, even if it was done in the hope that it might prompt the disclosure of additional information helpful to the investigation. Second, the appellant, unlike the accused in *Borodzik,* waived his *Miranda* rights and, therefore, was not protected from such a stratagem, so long as he was not deprived of the opportunity to decide freely for himself whether or not to remain silent. He had that opportunity in the privacy of a room with his wife, away from the immediate presence of the detectives. He remained there for several minutes undoubtedly weighing the difficult choices before him. As desperate as he may have felt at that moment, the appellant was afforded the time to reflect upon his decision. He took that time and subsequently elected to confess. In short, this is not an instance of a hapless accused who simply capitulated or acquiesced to the overbearing demands of aggressive law enforcement agents seeking a confession. Although Detective Hickson's comments may have implied a threat, they were relatively mild. Neither the threat alone nor its combination with the other factors surrounding the confession was, as a matter of law, so inherently coercive as to overcome the appellant's will to resist. Accordingly, we hold that the military judge did not err in admitting the confession into evidence.

## II. Access to Evidence

The appellant next contends that the military judge erred by denying his motion to dismiss the charges and specifications after the child's brain and the meninges or covering around the brain were inadvertently discarded before they could be examined by a

---

10. We note, however, that there is no requirement that an accused be "totally rational and properly motivated" to make a constitutionally admissible confession. *Connelly,* 479 U.S. at 166, 107 S.Ct. 515.

11. The accused's wife in *Culombe* was asked by the police to help them obtain a confession when she was brought to the police station to meet with her husband. *Culombe,* 367 U.S. at 613, 81 S.Ct. 1860.

defense medical expert, thereby depriving him of evidence necessary for his defense. We disagree.

## A. Background

On 9 June 1994, the day after the victim died, Dr. Arruza, the forensic pathologist for the Jacksonville Medical Examiner's Office [MEO], conducted an autopsy on the body. She discovered a fracture on the back of the victim's skull that, in her opinion, was caused by blunt force trauma, leading to the fatal brain injury. After examining the body for other signs of possible abuse, she concluded that the death resulted from a nonaccidental injury that occurred on or about 4 June 1994. During the autopsy, Dr. Arruza removed the brain and its meninges from the cranium for further examination. She sliced the brain at various depths to check for the presence of infarcts (areas of dead tissue in the brain that occur from prolonged deprivation of blood). Since an unaided visual inspection of the brain tissue disclosed no obvious signs of infarcts, she did not conduct a confirmatory, microscopic examination of the tissue. Photos were taken by Dr. Arruza's technical assistant at various points during the autopsy, but none specifically showed the brain as it was being examined for infarcts.

After the autopsy, Dr. Arruza had the brain and its meninges stored in specimen containers in her lab. The lab regulations require specimens to be maintained for one year, although this period may be extended at the discretion of the MEO. When the cause of death can be established with reasonable medical certainty, a report of the autopsy findings is made available to the State Attorney's office, and the specimens are either retained or delivered to the law enforcement officers, if the death was due to a homicide. The regulations, however, authorize the independent examination and analysis of physical evidence retained by the MEO, provided it is done under the supervision and control of MEO staff. During a planned move to a new lab in December 1994, Dr. Arruza's assistant inadvertently discarded the specimen container with the

brain and its meninges, instead of retaining it as he had been directed to do.

In June 1995, the appellant was tried in state court. After the trial judge granted the appellant's pretrial motion to suppress his confession and his ruling was upheld on appeal, the local prosecutor moved in *nolle prosequi* to terminate the state court proceedings. The Navy then assumed jurisdiction over the case. The current court-martial charges were preferred against the appellant in April 1996, while he was assigned to Naval Air Station, Jacksonville. A pretrial investigation was convened pursuant to Article 32, UCMJ, in June 1996, and charges were referred to a general court-martial in July 1996.

At trial, the appellant moved to dismiss the charges on the grounds that his due process rights under the Fifth and Sixth Amendments of the Constitution,[12] Article 46 of the UCMJ, 10 U.S.C. § 846, and Rule for Courts–Martial 703(f)(2) of the Manual for Courts–Martial, United States (1995 ed.) had been violated as a result of the Government's failure to provide the defense with access to the missing evidence. *See* Appellate Exhibit XXXV at 2. The appellant's argument included the following statement:

> This evidence is central to the defense in this case, and in fact is central to the government's case as well. The government will rely heavily upon its scientific examination of the brain tissues to prove the time and mechanism of death. The defense would rely almost exclusively upon its own scientific study of the brain not only to impeach the government's witnesses, but also to establish the defense theory of the mechanism and time of injury in this case.

Appellate Exhibit XXXV at 1–2.

After extensive testimony from two medical experts on the significance of the missing evidence, the military judge denied the appellant's motion. The experts differed in their opinions as to when the fatal injury most likely occurred. The issue as to the timing of the injury was important for both the Government and defense theories of the

---

12. The appellant asserted that "his right to present a defense (5th Amendment) [and] his right to

cross-examine witnesses (6th Amendment)" were adversely affected. Appellate Exhibit XXXV at 2.

case. The Government maintained that the medical evidence would corroborate the appellant's admission that he had fatally injured his son on 4 June 1994. The defense would argue that the injury was sustained several weeks earlier, when the child was most likely struck on the head by his four-year-old sister with an aluminum baseball bat or while engaged in self-abusive, headbanging behavior.[13] Both experts agreed that a microscopic examination of the missing evidence, particularly the meninges, could have pinpointed the approximate timeframe of when the injury occurred. But they agreed, too, that a microscopic examination of the skull fracture, which was preserved and available for defense examination, could also help to narrow down the timeframe of the injury.

After determining that the MEO staff had not discarded the missing evidence in bad faith, the military judge applied the two-prong test established by the Supreme Court in *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and later adopted for court-martial practice by our superior court in *United States v. Kern*, 22 M.J. 49, 51 (C.M.A.1986). He found the appellant had failed to show that the missing evidence was apparently exculpatory and that comparable evidence was not reasonably available. Appellate Exhibit LXI at 6. Therefore, the loss of this evidence did not violate the appellant's rights to due process and confrontation, nor did it impair his ability to obtain a fair trial. *Id.* at 8. However, the military judge moved aggressively to preclude the prosecution from using the missing evidence to attack the credibility of the defense experts or bolster the credibility of its own expert by stating:

One concern this Court has, however, is the trial counsel's line of questioning and argument during the motion hearing whereby he stated and inferred that Dr. Arruza's testimony should be given greater weight than the defense expert because, in part, her testimony is based upon her direct observation of the [sic] Timmy's brain and surrounding tissues, while the defense expert did not actually view the brain and surrounding tissues.... [T]he government will not be entitled to use MEO's negligent and inadvertent loss of Timmy's specimen as a prosecutorial sword to bolster unfairly the weight of testimony that may be given by Dr. Arruza. This Court concludes that some limitation upon the prosecution's examination of witnesses and argument is necessary to preclude unfair bolstering. Accordingly, this Court's ruling (Ruling 3 above)[14] is deemed to be an adequate and appropriate remedy to preclude unfair bolstering.

*Id.* He then followed up later in the trial by instructing the members before they retired to deliberate on findings that they could not give less weight to the opinion testimony of an expert witness solely because he did not have the same opportunity, which Dr. Arruza had, to personally examine the brain and its covering. *See* Record at 2942–43. In fact, he went further by specifically instructing the members:

Additionally, you have heard the opinion of Dr. Odom that he would have expected microscopic examination of the meninges and of the brain of Timothy J. Ellis, Jr. to show results consistent with his opinion as to the cause of death. You may consider his opinion as to *what he expected the microscopic examination to show* even

13. According to Dr. Odom, the expert who later testified in the appellant's case-in-chief, the victim's skull fracture was more than several days old and perhaps as much as three weeks old at the time of death; the photographic evidence suggested that the victim died of a sub-acute, subdural hematoma stemming from a traumatic injury that occurred more than a few weeks prior to the victim's death; and a blow to the back of the skull with an aluminum bat could have been the cause of the skull fracture. Appellate Exhibit LXI at 3 (FF # 8).

14. "Ruling 3" of the military judge's rulings on this defense motion barred the prosecution from arguing or pursuing any line of questioning that would state or infer that the opinion of its expert, Dr. Arruza, merited more weight than the opinions of the defense experts because of her opportunity to examine the missing evidence during the autopsy. Appellate Exhibit LXI at 1. The only exception to this bar would be if the defense "opens the door" by attempting to unduly mislead the trier of fact. *Id.*

though the brain and the meninges were not available for microscopic examination. Id. at 2943 (emphasis added).

## B. Law

The leading "access-to-evidence" case directly addressing the Government's failure to preserve potentially exculpatory evidence is *Trombetta,* the case that the military judge relied upon in making his ruling. In *Trombetta,* the Supreme Court stated:

Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed "what might loosely be called *the area of constitutionally guaranteed access to evidence.*" *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Taken together, this group of constitutional privileges [15] delivers *exculpatory evidence* into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.

*Trombetta,* 467 U.S. at 485, 104 S.Ct. 2528 (emphasis added). The Court recognized, however, that "[w]henever *potentially exculpatory evidence* is permanently lost [through prosecutorial neglect or oversight], courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Id.* at 486, 104 S.Ct. 2528 (emphasis added). Thus, the Court clarified the distinction between cases where the prosecution fails to disclose evidence that it has in its possession and cases where the prosecution loses or destroys evidence that it once had in its possession. In the latter instances, so long as there was no official action to circumvent the constitutionally required disclosure requirements, the disputed evidence must meet the test of "constitutional materiality" for a denial of due process to exist. *Id.* at 489, 104 S.Ct. 2528. In other words, "[the] evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* In *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the Court clarified *Trombetta* further: first, by noting that "[its] decisions in related areas have stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government," *id.* at 57, 109 S.Ct. 333, and, second, by making explicit from its analysis of *Trombetta* that, "unless a criminal defendant can show *bad faith* on the part of the police, failure to preserve potential useful evidence does not constitute a denial of due process of law." *Id.* at 58, 109 S.Ct. 333 (emphasis added).

■ In applying *Trombetta* to courts-martial practice, our superior court acknowledged that Article 46, UCMJ,[16] appears to go beyond the constitutional requirement of granting criminal defendants access to favorable evidence. Military defendants have a *statutory right of equal access to all evidence,* whether or not the evidence is exculpatory. *Kern,* 22 M.J. at 51. But, the court

15. *See United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)(holding that prosecution must turn over exculpatory evidence, even in the absence of specific request by defendant); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)(holding that prosecution must reveal contents of plea agreements with key prosecution witnesses); *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)(holding that defendant has right to prosecution evidence that is material to guilt or relevant to punishment of defendant); *Napue v. Illinois,* 360 U.S. 264, 269–72, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)(holding that prose-cution must inform defendant and trial court that government witness lied under oath); *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957)(holding that, under certain circumstances, prosecution must disclose identity of undercover informants possessing evidence critical to the defense).

16. "The trial counsel, the defense counsel, and the court-martial shall have *equal opportunity* to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." Art. 46, UCMJ (emphasis added).

strongly rejected the notion that the UCMJ required a broader rule for the preservation of evidence, stating:

> [Article 46, UCMJ] does not place stricter requirements on the Government to preserve evidence which is not "apparently" exculpatory than is required of the states under the fourteenth amendment to the Constitution. The rule announced in *Trombetta* satisfies both constitutional and military standards of due process and should therefore be applicable to courts-martial.

*Id.* In *United States v. Manuel*, 43 M.J. 282 (1995), however, the court seemed to imply that the constitutional and military due process standards governing the preservation of evidence may not always be coextensive. The court affirmed the decision of the Air Force Court of Military Review, which had set aside the accused's conviction for cocaine use because the Government inadvertently discarded the accused's urine sample after testing it and, thereby, precluded the accused from having the sample retested. *Id.* at 289. In addition to finding that the official regulations governing the urinalysis program conferred a substantial right for the Air Force member to have his urine sample retained for defense discovery, the court stated:

> [R.C.M. 703(f)(2) ][17] is illustrative of the President's going even further than the Constitution and the Uniform Code in providing a safeguard for military personnel. This rule gives the court *discretion* to fashion an *appropriate* remedy if lost "evidence is of such central importance to an issue that it is essential to a fair trial."

*Id.* at 288. Thus, it appears the "bad faith" requirement that *Youngblood* added to *Trombetta's* two-prong test is not part of the analysis under R.C.M. 703(f)(2). *See Manuel*, 43 M.J. at 294 (J. Crawford, dissenting).

 Accordingly, we believe that the mishandling of potentially exculpatory evidence by the Government is a constitutional denial of due process *requiring* appropriate relief when an accused is able to show (1) that the missing evidence possessed exculpatory value that was or should have been apparent to the Government before it was lost or destroyed, (2) that comparable evidence is not reasonably available, and (3) that the Government demonstrated bad faith in failing to preserve the evidence. *United States v. Mobley*, 31 M.J. 273, 277 (C.M.A. 1990). However, even in the absence of bad faith, the military judge must still provide appropriate relief under R.C.M. 703(f)(2) when access to the missing evidence is found to be essential to a fair trial for the accused. In either instance, the military judge fashions "such remedies as are appropriate to protect the fundamental rights of the accused" and the "[d]etermination of an appropriate remedy is left to [his] sound discretion." *Kern*, 22 M.J. at 52; *accord Manuel*, 43 M.J. at 289.

## C. Discussion.

 On the constitutional claim that the loss of the missing evidence constituted a violation of due process, we believe the military judge's factual findings were not clearly erroneous and that he correctly applied the law, as set forth in *Trombetta*, *Youngblood*, and *Kern*. Assuming *arguendo* that the evidence potentially had some exculpatory value, it clearly was not apparent before the missing evidence was discarded. Dr. Arruza examined the brain and its meninges and, in her professional judgement, saw nothing indicating a further need for microscopic examination of the brain tissue. According to Dr. Arruza, the extensiveness of the brain swelling and the rapid deterioration of the child prior to death pointed to a very recent injury, and the appellant's confession corroborated her autopsy findings that the fatal trauma to the child's brain occurred relatively close to the time of death. Therefore, even though

---

17. R.C.M. 703(f)(2) provides:

Notwithstanding subsection (f)(1) of this rule, a party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process. However, if such evidence is of such central importance to an issue that it is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to attempt to produce the evidence or shall abate the proceedings, unless the unavailability is the fault of or could have been prevented by the requesting party.

the appellant's wife may have mentioned the baseball bat incident and the child's tendency towards self-inflicted injury as *possible* causes of the fatal injury, there was little, if any, reason for Dr. Arruza to assume that the brain and its covering had any apparent exculpatory value prior to December 1994, when they were discarded. According to the appellant's own expert, Dr. Odom, he would not have done a microscopic examination either, unless an issue first surfaced concerning the age of the injury. *See* Record at 412. In short, by the time the age of the injury became an issue in this case, the Government no longer had the missing evidence in its possession.

As for the second prong of the *Trombetta* test, the appellant was able to raise the same defense from other comparable evidence. The military judge succinctly summarized this body of evidence in his findings and conclusions:

> Dr. Odom, for example, felt confident, based upon his review of the photographs taken at the autopsy and his examination of Timmy's skull portions preserved by MEO, that [the] fracture probably occurred weeks before Timmy's death and that the cause of death was a sub-acute, subdural hematoma which began to develop weeks before Timmy's death. He was able to point out the areas on the photographs that he considered important to his opinion. His expert opinion based upon these observations is indicative of an injury occurring weeks before Timmy's death, and said opinion is consistent with a theory of the defense that Timmy's skull fracture and related brain damage may have been caused during an incident whereby Timmy's sister, Terry, hit him on the head with an aluminum baseball bat. Additionally, the defense has access to [the] following witnesses and evidence relevant to the cause and timing of death: the neurosurgeons and radiologists involved in Timmy's diagnosis and treatment at the University Medical Center, the medical reports attendant to his treatment, and Dr. Arruza, her reports, and all the autopsy photos taken by MEO. The defense also has

access to the family and social history relevant to the case.

Appellate Exhibit LXI at 7.

Finally, there is no evidence in the record to suggest the MEO staff acted in bad faith in discarding the missing evidence. According to the Supreme Court, "bad faith" refers to "those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58, 109 S.Ct. 333. *See also id.* at 56 n.* (noting that the existence of bad faith "must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed"); *Trombetta*, 467 U.S. at 488, 104 S.Ct. 2528 (indicating that bad faith requires some showing of "official animus towards [the accused] or [ ] a conscious effort [by officials] to suppress exculpatory evidence"). Therefore, to conclude that there was bad faith from the circumstances surrounding the loss or destruction of evidence by the Government, we would first have to find that the MEO staff knew or suspected the evidence was potentially exculpatory and that they discarded it to circumvent the appellant's right of discovery. There are no facts before us to support such a conclusion. Accordingly, we find that the appellant's constitutional right to due process was not violated.

The military judge also conducted a separate analysis essentially addressing the elements of R.C.M. 703(f)(2) in the course of distinguishing the facts in this case from those in *Manuel*. Although he relied, in part, upon a finding of "simple negligence," Appellate Exhibit LXI at 6, as contrasted to the finding of gross negligence in *Manuel*, in characterizing the Government's handling of the missing evidence, we are hard pressed to see any difference in the material facts. In both instances, the lab technicians inadvertently discarded the evidence, contrary to an explicit rule or instruction. However, we find that the degree of negligence is not critical to our resolution of this issue under R.C.M. 703(f)(2). More important was the fact that there was no showing that the missing evidence was essential to a fair trial. As we indicated earlier, the appellant was

still able to put on a defense supported by the same expert testimony. In fact, the mishandling of the evidence may have strengthened his argument that there was reasonable doubt in this case. It allowed his counsel to argue that, without the missing evidence, the members could never be "firmly convinced" of the appellant's guilt. Record at 2899–900. Just as we found no constitutional violation of due process, we also find no basis for relief under the President's more liberal mandate in R.C.M. 703(f)(2). Accordingly, we conclude that the motion to dismiss was properly denied.

### III.

We have carefully considered all of the remaining assignments of error and have found them to be without merit. With respect to the appellant's claims regarding the sufficiency of the evidence, we have determined that the findings are both legally and factually sufficient. *United States v. Turner,* 25 M.J. 324, 324–25 (C.M.A.1987). Accordingly, the findings and sentence, as approved on review below, are affirmed.

Senior Judge ANDERSON and Judge NAUGLE concur.