BAKER, Judge
(concurring in the result):
I agree with Judge Effron’s factual recitation and legal framework for addressing the *384 relationship between Issue I and Issue II; however, I join the conclusion in the lead opinion that appellant’s statement was voluntary and any error by the military judge in failing to provide an appropriate remedy in view of the lost evidence was harmless.
Although I agree with the result reached in the lead opinion, I write separately to address concerns I have about the way the result is reached. On Issue I, the majority opinion fails to capture or acknowledge the potentially coercive effect a threat to deprive parents of their access and rights to their children may have on their custodial confessions. I believe that such threats carry with them an increased risk that parents may confess involuntarily; and as such, courts must review the confessions rendered under such threats with heightened sensitivity. With respect to Issue II, I do not join the apparent conclusions in the lead opinion regarding the mental processes of the members. While I agree that any error was harmless, I am not prepared to step into the shoes of the members and state with certainty what members were, or were not, prepared to consider and just how reliable and voluntary they might have found appellant’s confession to be. Moreover, the lead opinion relies on a factual theory involving review of medical evidence that was not presented to the members. Nonetheless, I am confident there was no reasonable likelihood that any error by the military judge affected the findings. Therefore, for the reasons stated below, I agree to affirm.
I.
The Supreme Court has recognized that “[vjery few people give incriminating statements in the absence of official action of some kind.” Schneckloth v. Bustamonte, 412 U.S. 218, 224, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). It has also recognized that “custodial police interrogation, by its very nature, isolates and pressures the individual,” Dickerson v. United States, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), and that it “trades on [his or her] weaknesses].” Miranda v. Arizona, 384 U.S. 436, 455, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Nevertheless, the Court has also held that “certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment.” Miller v. Fenton, 474 U.S. 104, 109, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Whether interrogation tactics are coercive and exceed constitutionally permissible limits is determined by looking at the totality of the circumstances in each case. Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).
In this case, the civilian police officers sought to trade upon and exploit any emotional ties appellant might have to his six surviving children. The critical question for purposes of this appeal therefore is: Did the police exceed permissible conduct in doing so?
For love of children parents will do many things that escape the bounds of common sense or elude concepts of natural law. But as this case illustrates, some parents are also capable of abhorrent criminal conduct toward their children. The law has not heretofore provided a per se prohibition on police officers discussing the fate of a suspect’s children during interrogation. Nor should it. The fate of such children may be relevant to the offense, a necessary by-product of the criminal process, or, indeed, may serve as a source of lawful police leverage and a truth-finding vehicle. However, given the complex emotional ties between parent and child, such interrogation methods will present inherently close and contextual questions as to whether any subsequent statement is indeed voluntary. This is why a “totality of the circumstances” test is used. Law enforcement officers, and the courts that review their actions, must proceed with heightened sensitivity to test the validity of any confession given subsequent to a discussion relating to an accused’s family members, to ensure that police conduct does not offend justice. Such care was taken in this case.
Both the military judge and the Court of Criminal Appeals concluded that appellant’s recorded statement occurred after he re *385 ceived and voluntarily and intelligently, waived his Miranda rights. 54 MJ 958, 967 (2001). These rights, and appellant’s waiver of them, were reaffirmed prior to appellant’s confession. The officers surely hoped to pressure appellant or his wife into confessing, but they did not badger him, scream at him, otherwise bully him down this path, or discourage or impede the exercise of his rights. While appellant no doubt felt pressure to confess, the length and content of the interrogation was not overbearing. The statements concerning the fate of appellant’s children were certainly within the realm of possibility. Appellant’s confession followed a meeting with his wife rather than just after his time with the police. Furthermore, as pointed out in the lead opinion, the confession itself admitted far more, in terms of the number of incidents, the provocation for the incidents, and the level of brutality, than would have been required for appellant to protect his wife from prosecution by falsely confessing. According to the court below:
The appellant admitted to the detective that, on 2 June 1994, he struck Timmy in the face and then grabbed the child’s head and pounded it on the shower floor several times after Timmy defecated in his pants and started playing with the feces. Detective Robinson left the room and returned with Sergeant Japour. The appellant was advised that his admission was inconsistent with the medical evidence pointing to a more recent injury. The appellant then admitted that he had also assaulted Timmy on 4 June 1994. He stated that he became very angry because the child would not eat his breakfast and was picking again at a sore inside his lip. So, he stood the child on a small picnic table in the family garage and struck him with sufficient force to knock him to the ground. The appellant then grabbed the child by the head and pounded it several times against the cement floor.
Id. at 960.
Finally, given the totality of all these circumstances the military judge put the context and veracity of appellant’s confession squarely before the members.[1] In short, the military judge and the CCA addressed this confession with the caution and care required. Their findings of fact are not clearly erroneous. Reviewing the lower courts’ application of law to facts de novo, I reach the same legal conclusion as that in the lead opinion, and the court below—appellant’s confession was voluntary.
II.
The military judge sought to address the missing evidence in three ways. First, after hearing evidence on the defense motion for relief, the military judge ruled that the Gov *386 ernment could not argue to the trier of fact that its expert’s opinion merited more weight because only she had the opportunity to personally observe the brain and surrounding tissue during the autopsy. Second, he ruled that the prosecution could neither direct questions, nor cross-examine witnesses, where the intended or probable response would imply that the Government witness’ opinion was of greater weight simply because of her unique opportunity to make certain observations during the autopsy. Finally, at the close of the case on the merits, the military judge instructed the members (1) that they were prohibited from drawing an inference adverse to the weight of the defense expert’s testimony solely because he had not had the opportunity to personally view or test the lost evidence, and (2) that they could consider the defense expert’s opinion as to what he expected a microscopic examination to show even though the brain and meninges were not available for his examination.
Appellant contends that in at least three instances the trial counsel undermined the reliability of the defense expert’s opinion by emphasizing during cross-examination that Dr. Charles Odom had not examined the brain and dura. During the cross-examination of Dr. Odom, the trial counsel attempted to attack Dr. Odom’s conclusion that he was confident to a reasonable medical certainty that the child’s fatal injury occurred some two to three weeks before June 4. He attempted to impeach the doctor with his testimony from an earlier court session pursuant to Article 39(a), UCMJ, 10 USC § 839(a), during which the doctor had indicated that without the ability to microscopically examine some tissue visible in one of the autopsy photographs, he was not willing to stake his reputation on his conclusion regarding the date of the injury. As a result, appellant argues that the trial counsel violated the military judge’s rulings and that the judge’s subsequent instruction regarding the defense expert’s testimony was an inadequate remedy. In appellant’s view, an adverse inference instruction was required.
In my opinion, the military judge provided an adequate remedy for the missing evidence by admonishing the Government not to use the missing evidence to impeach the defense expert and by giving the members a limiting instruction at the close of arguments. Arguably, error occurred when trial counsel nonetheless sought to impeach the defense expert on the ground that he had not examined the missing brain tissue depicted in one of the photographs, and the military judge did not take immediate corrective action. However, even if one concludes that the instruction did not cure the error, it factors into the harmless error analysis.
Both the government and defense experts agreed that microscopic examination of the skull could narrow the timeframe of the injury. 54 MJ at 970. Dr. Margarita Arruza, the government expert, testified that her examination of the brain tissues placed the date of injury on June 4, not three weeks earlier as asserted by the defense. She concluded, based on a microscopic examination of the skull two and a half years after performing the autopsy, that the skull had been fractured twice, with the newest injury being four days old at the time of death. The defense expert, Dr. Odom, disagreed, testifying that his microscopic examination of the skull showed that the fatal injury was inflicted approximately three weeks prior to death.
If the adverse inference instruction had been given, the members would have been permitted, but not required, to infer that the lost brain tissues would have supported the defense theory that the injuries were inflicted three weeks before death. The adverse inference instruction would have applied only to the lost brain tissues, not to the examination of the skull. The panel would still have been presented with competing expert views regarding examination of the skull. This in turn would diminish the importance of expert testimony and increase the importance of appellant’s confession.
As the lead opinion rightly states, appellant bore a heavy burden in attempting to persuade members that his confession was a false product of unlawful police pressure. As the Court stated in Arizona v. Fulminante, a voluntary and corroborated confession “is *387 like no other evidence. Indeed, ‘the defendant’s own confession is probably the most probative and damaging evidence that can be admitted against him____” 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). As noted above, appellant’s confession was particularly damaging. It was specific, graphic, and consistent with the Government’s theory of the case. It also went well beyond what was necessary to absolve appellant’s wife, or end a police interview of insignificant duration and lacking of duress. As a result, I am confident that if there was error regarding the military judge’s instruction to members, there was no reasonable likelihood it affected the findings.

. In his instructions regarding appellant’s audio-taped confession, the military judge admonished the members, inter alia, as follows:
It is for you to decide the weight or significance, if any, the accused’s pretrial statement deserves under all the circumstances. In deciding what weight or significance, if any, to give the accused’s statements, you may consider that evidence has been introduced that certain police interrogation techniques were employed during the initial interview and accusatory interview of the accused and that Detective Hickson made comments to the accused and Lauri Ellis concerning the probable involvement of HRS in the removal of the children from the Ellis' home if both the accused and Lauri Ellis were arrested.
You should consider the testimony of the witnesses concerning the taking of the statement, including their demeanor in the courtroom and how their testimony is either consistent or inconsistent with the prior statements they may have given. You should consider the environment in which the interviews and the statements were taken, including the physical layout of the spaces and whether rights advisements were given to the accused. Additionally, you should consider any evidence that you believe either corroborates or contradicts the matters asserted by the accused in his pretrial statement. You may also consider the accused's tone of voice and demeanor evidenced in Prosecution Exhibit 3.
I want to be veiy clear. These examples of the type of evidence you may consider in determining what weight you wish to give to the accused’s pretrial statement, in determining the truth or falsity of the statement, are illustrative only. You are at liberty to consider all of the evidence in the case that relates to the credibility of the accused’s pretrial statement in determining the weight and significance, if any, you want to give it. In determining this matter, you are permitted to use your own common sense and knowledge of human nature.