UNITED STATES, Appellee

v.

Timothy J. ELLIS, Aviation Electronics Technician Second Class
U.S. Navy, Appellant

No. 01-0590

Crim. App. No. 98-00729

United States Court of Appeals for the Armed Forces

Argued March 19, 2002

Decided September 30, 2002


CRAWFORD, C.J., delivered the judgment of the Court, in which GIERKE, J., joined.  SULLIVAN, S.J., filed an opinion concurring in part and in the result.  BAKER, J., filed an opinion concurring in the result.  EFFRON, J., filed a dissenting opinion.

<u>Counsel</u>

For Appellant:  Lieutenant <u>Rebecca S. Snyder</u>, JAGC, USN (argued).

For Appellee:  Lieutenant <u>Jason A. Lien</u>, JAGC, USNR (argued); <u>Colonel R. M. Favors</u>, USMC (on brief); <u>Major Robert M. Fuhrer</u>, USMC, and <u>Lieutenant Kevin S. Rosenberg</u>, JAGC, USNR.

Amicus Curiae:  Donald L. Vieira (law student)(argued); Steven H. Goldblatt and Abigail V. Carter (supervising attorneys), and Erin M. Schiller (on brief) - For the Appellate Litigation Program at the Georgetown University Law Center.

Military Judge:  Daniel J. D'Alesio, Jr.

**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION**.

Chief Judge CRAWFORD delivered the judgment of the Court.

Appellant was charged with assaulting his two-and-a-half-year-old son, Timothy Ellis, Jr. (Timmy), on June 2, 1994, and on June 3, 1994.  He was also charged with murdering Timmy on June 4, 1994.  Contrary to his pleas, appellant was convicted by officer and enlisted members of involuntary manslaughter and assault upon a child, in violation of Articles 119 and 128, Uniform Code of Military Justice (UCMJ), 10 USC §§ 919 and 928.  The convening authority approved the sentence of a bad-conduct discharge, six years' confinement, total forfeitures, and reduction to the lowest enlisted grade.  The Court of Criminal Appeals affirmed the findings and sentence in an opinion that chronicles the facts and evidence.  54 MJ 958 (2001).  We granted review of the following issues:

    I.  WHETHER THE MILITARY JUDGE ERRED IN FAILING TO SUPPRESS APPELLANT'S INVOLUNTARY CONFESSION.

    II. WHETHER THE MILITARY JUDGE ERRED IN FAILING TO DISMISS THE CHARGES OR TO ORDER OTHER APPROPRIATE RELIEF BASED ON THE GOVERNMENT'S DESTRUCTION OF KEY EVIDENCE.

We hold that the military judge did not err in failing to suppress the confession, and that any error in failing to take

appropriate action because of the destruction of evidence was harmless beyond a reasonable doubt.[1]

BACKGROUND

Two-and-a-half-year-old Timmy was one of seven children in the home of appellant and his wife. At the time of his death, Timmy weighed 38 pounds and was 35 inches in length. In April, 1994, one month after appellant gained custody over Timmy and his four-year-old sister Teresa from appellant's ex-wife (and mother of the children), he called Ms. Carmen L. Colon, a case manager for the Family Advocacy Program at the Naval Air Station, Jacksonville, Florida. Appellant told Ms. Colon that he was having problems coping with Timmy's and Teresa's impact on the family and indicated he wanted to return them to the custody of the state rather than to his ex-wife. As appellant was undergoing family counseling, no decision was made on his request to return Timmy to the state for care.

On June 4, 1994, appellant's wife brought Timmy, who was unconscious, to the Naval Hospital in Jacksonville. He was then transferred to the University of Florida Medical Center (Medical Center), where he died four days later.

---

[1] We heard oral argument in this case at the Georgetown University Law Center, Washington, DC, as part of the Court's "Project Outreach." See United States v. Pritchard, 45 MJ 126, 127 n.1 (1996).

On June 8, Mr. Louis N. Eliopulos, the Chief Investigator and Operations Manager for District Four, Medical Examiner's Office, Jacksonville, was informed of Timmy's death by someone associated with organ retrieval at the Medical Center. Mr. Eliopulos called Detective Anthony Hickson of the Jacksonville Sheriff's Office, Homicide Division, that same day to inform him of Timmy's death. Prior to Mr. Eliopulos's telephone call, Detective Hickson knew nothing about Timmy's death. At the time of this initial telephone call, there was no suspicion of homicide -- Mr. Eliopulos called Detective Hickson because it was a case for donor organs. After Mr. Eliopulos's telephone call was received, Detective Hickson read a report from Mr. Ishmael Woods, a Human Resources Services (HRS) caseworker. Mr. Woods was the official child abuse investigator for HRS on this case. Detective Hickson remembered Mr. Woods's report reflecting the opinion of a doctor that this was not a child abuse case.

On June 9, Dr. Margarita Arruza, an Associate Medical Examiner for Jacksonville, conducted an autopsy on Timmy. Dr. Arruza determined that the cause of death was blunt trauma to the head. Detective Hickson talked to either Mr. Eliopulos or Dr. Arruza on June 9 after the autopsy. After that

conversation, Detective Hickson suspected that Timmy's death was due to "child abuse homicide."

On June 10, when appellant and his wife voluntarily arrived at the Jacksonville Sheriff's Office, Detective Hickson certainly suspected a case of child abuse homicide, but he had conflicting reports concerning the possible causes of Timmy's death. Appellant and his wife were met by Mr. Eliopulos and Detective Hickson. Mr. Eliopulos was present pursuant to normal operating procedures when one of the caregivers discovers an injured child. He had no substantial role in the interrogation and was present to gather medical, social, and family history information from appellant and his wife.

After gathering information and listening to the initial questioning of appellant and Mrs. Ellis, Mr. Eliopulos called his office to determine whether the victim's injuries could have been caused by the victim accidentally striking his head on a desk as Mrs. Ellis intimated. After determining that such a striking lacked sufficient force to cause the injuries observed at the autoposy, Mr. Eliopulos informed Sergeant Frank Japour and Detective Hickson that he believed a formal interrogation of both family members was appropriate and left the office.

Based upon the initial interviews, Detective Hickson concluded that the victim had been in the sole care of appellant

and his wife before he was brought to the hospital. He also concluded that neither appellant nor his wife had provided a satisfactory explanation for the son's injury. However, neither was arrested. At that point, Detective Hickson decided to proceed with separate accusatory interviews. Appellant and his wife, who separately were provided with Miranda warnings, each waived the privilege against self-incrimination, as well as the right to consult with counsel. 54 MJ at 960.

As described by the Court of Criminal Appeals, Detective Hickson, in the separate interrogations of appellant and his wife, first "informed each of them that he believed there was probable cause to arrest both of them for child abuse." Id. Next, he "indicated that, if both of them were arrested, their other six children would probably be removed from their home by officials from the Department of Human and Rehabilitative Services [HRS] and temporarily placed in foster care." Id.

Both appellant and his wife denied any pertinent knowledge. Appellant's wife, who was interviewed first, also asked to speak to appellant. That request, which was denied initially, was granted after his interrogation in the hopes that it would lead to further information. After meeting with his wife for about 15 minutes, appellant indicated that he wanted to talk.

6

After appellant had waived his rights in writing, Detective Michael Robinson and Sergeant Japour made an audio tape of appellant's statement under oath. He confirmed being advised of his rights and his willingness to speak with them without a lawyer. Appellant indicated Timmy was the hardest child to deal with, and Teresa, the four-year-old who looked like a two-year-old, was just a little bit better. Both Teresa and Timmy were his children by his first wife. After she stopped taking birth control pills, she became pregnant so appellant would not ask for a divorce. He admitted Timmy "wasn't brought into this world under the best of conditions, [but] I still loved him." When Timmy and Teresa moved in during March 1994, they turned the household upside down. Appellant admitted that he would have liked to place them in a foster home because he could not take care of them.

On Friday, June 2, appellant was watching the children while his wife was with Teresa at a family counseling session. When he went into the bedroom, he noticed that Timmy had "pooped in his pants." Appellant took him into the bathroom, and the feces fell out of his underwear and onto the floor. Appellant asked Timmy to pick it up. He did not. He just "pushed it around the floor a little bit." Appellant became angry and again told him to pick it up. Timmy did, but dropped the feces.

Finally, Timmy put it in the toilet, at which time appellant, who stood 6 feet 2 inches tall and weighed 230 pounds, hit Timmy on the left side of the face, knocking him into a wall. He pulled him up and dragged him by his feet towards him and started beating him by pounding the back of his head three or four times against the floor. Timmy did not lose consciousness. Later in the day, he was thought to have had a couple of seizures.

On Sunday, June 4, they were having a hard time getting Timmy, who was in the garage, to eat. Mrs. Ellis told appellant she could not handle Timmy any longer. Appellant went into the garage and closed the door. Angry, he picked Timmy up, placed him on the picnic table, and then hit him so hard he knocked him off the table. He fell off the table and hit his head on the concrete floor. Appellant again grabbed Timmy and, three or four times, hit his head on the concrete floor. Shortly thereafter, Timmy became unconscious and he was taken to the emergency room.

Five days earlier, while Timmy was showering, he hit his head, resulting in a trip to the hospital for stitches. Appellant admitted Timmy was self-abusive. As a result, they had to tape his feet and hands to control him. To do the

8

taping, the doctor showed him a trick with a pillowcase and a sheet so they could restrain him to place the tape on him.

DISCUSSION

Confession

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself nor be deprived of life, liberty, or property without due process of law...." Congress has implemented this constitutional mandate in Article 31(d), UCMJ, 10 USC § 831(d), which prohibits the admission of any statement into evidence that is "obtained ... through the use of coercion, unlawful influence, or unlawful inducement...." Consequently, an accused's confession must be voluntary to be admissible into evidence. Dickerson v. United States, 530 U.S. 428, 433 (2000).

The voluntariness of a confession is a question of law which we review de novo. See Arizona v. Fulminante, 499 U.S. 279, 287 (1991). Whether the confession is voluntary requires examining the "totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); United States v. Ford, 51 MJ 445, 451 (1999). "[I]n [a] family context, we can imagine circumstances involving threats, promises, or other inducements that would raise questions of the

9

voluntariness of an accused's statements...." United States v. Moreno, 36 MJ 107, 112 (CMA 1992).

Moreno was questioned by the Texas Department of Human Services regarding allegations of child sexual abuse and was faced with a choice of cooperating and possibly keeping custody of his children, or not cooperating and increasing the risks that his children would be taken away. Id. at 109, 112. The Court noted that this dilemma was of his own making. Id. Additionally, there was no improper threat; rather appellant was "merely apprised ... where he stood in the great flow of things." Id.

In examining the totality of circumstances, we do not look at "cold and sterile list[s] of isolated facts; rather, [we] anticipate[ ] a holistic assessment of human interaction." United States v. Martinez, 38 MJ 82, 87 (CMA 1993). The totality of the circumstances include the condition of the accused, his health, age, education, and intelligence; the character of the detention, including the conditions of the questioning and rights warning; and the manner of the interrogation, including the length of the interrogation and the use of force, threats, promises, or deceptions.

Appellant was a 27-year-old Petty Officer Second Class (E-5) with nine years of active duty service, a high-school

diploma, and an AFQT score that placed him in the "upper mental group" of Navy classifications. There was no evidence appellant suffered from any psychological handicaps that affected his decision-making ability. We examine the soundness of appellant's physical and psychological character at the time of interrogation to determine whether the statements were voluntary.

While the detectives' advice to appellant concerning removing the remaining children from the home may have contributed to his confession, the mere existence of a causal connection does not transform appellant's otherwise voluntary confession into an involuntary one. See Colorado v. Connelly, 479 U.S. 157, 164 n.2 (1986). While this consequence of appellant's criminal conduct was unpleasant, the law enforcement officers' advice was an accurate picture of what would happen in similar cases.

Not only must we examine the circumstances surrounding the taking of the statement regarding what was done or said, but we must also examine what was not done or not said. There were no threats or physical abuse. See, e.g., Payne v. Arkansas, 356 U.S. 560, 566 (1958). The questioning did not continue for days; there was no incommunicado detention, and no isolation for a prolonged period of time.

Additionally, the detectives did not use appellant's wife as a government tool to induce him to confess. See, e.g., United States v. Borodzik, 21 USCMA 95, 97, 44 CMR 149, 151 (1971). Initially, the detectives had no idea which spouse may have caused Timmy's injury. Accordingly, they spoke to both privately. Mrs. Ellis then talked to appellant. After this conversation, appellant confessed.

Viewing all the facts taken together, we agree with the Court of Criminal Appeals that they were not "so inherently coercive as to overcome the appellant's will to resist." 54 MJ at 968.

### Due Process and Destruction of Evidence

On June 9, Dr. Arruza performed an autopsy and concluded that death was caused by non-accidental blunt trauma to the head on June 4. In addition to the 9.5 centimeter fracture in the skull, there were injuries around both eyes, the right check, the left jaw, and the upper neck. There was a cut on the lip. There was bodily injury on the left side of the chest, the lower left hip, on the back, the right forearm, the right and left knees, and right and left lower legs.

Following the autopsy, Dr. Arruza arranged for storage of the brain and its meninges pursuant to a laboratory regulation providing for specimens to be maintained for at least one year.

Several months later, however, the specimen container was inadvertently discarded when the laboratory was moved to a new location. See 54 MJ at 969.

At trial, appellant moved to dismiss the charges, citing RCM 703(f)(2), Manual for Courts-Martial, United States (2000 ed.),[2] which provides in pertinent part with respect to evidence that has been destroyed or lost:

> [A] party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process. However, if such evidence is of such central importance to an issue that it is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief....

(Emphasis added.) Appellant also relied upon the right to present a defense under the Fifth Amendment, the right to cross-examine witnesses under the Sixth Amendment, and the right to obtain witnesses under Article 46, UCMJ, 10 USC § 846. Id.

Appellant contended that the missing evidence was central to both parties, noting that the prosecution would rely on testimony about the brain tissue to establish the time of death, and the defense would rely on scientific examination of the brain to both impeach the Government's witness and to establish a defense theory as to the time and cause of death. Id. at 969-70. The defense theory of the case was that the fatal injuries

---

[2] All Manual provisions cited are identical to those in effect at the time of appellant's court-martial.

13

had been inflicted by a baseball bat wielded by appellant's daughter several weeks earlier, or by the son's self-abusive head-banging behavior.  See id.

Defense counsel asked the military judge to address the harm caused by the missing evidence by giving an adverse inference instruction, permitting the members to infer a fact against the Government's interest if the Government lost or destroyed evidence whose content or quality was at issue.  Such an instruction would have permitted, but not required, the members to draw an inference against the Government's theory that Timmy's death resulted from the beating appellant administered on June 4.  The military judge declined to give the requested instruction.

An adverse inference instruction is an appropriate curative measure for improper destruction of evidence.  We need not decide, however, whether the military judge erred by refusing to give an adverse inference instruction, because we hold that any error in this regard was harmless beyond a reasonable doubt in light of appellant's confession, which we discuss infra.

Extensive evidence was introduced by Timmy's grandmother, the babysitter, and others, that Timmy was hit on the head with an aluminum baseball bat three weeks earlier by Teresa. Additionally, the defense experts were able to examine the x-

14

rays, the CAT scans, and the medical records to form an opinion as to the timing and cause of death. The defense witnesses indicated, based on this evidence, that there was a pre-existing injury and it was the re-bleeding of that injury that caused Timmy's death.

Dr. Charles Odom, a defense witness, testified that if there was a pre-existing injury, hitting that area could cause a new injury and the fracture could open. He stated that it would not take the same degree of force to cause a re-injury, swelling, and death in this case. He opined that the baseball bat injury three weeks prior to Timmy's death was the traumatic, blunt force injury that caused his sub-acute, subdural hematoma, and death. However, he also testified that there was a real possibility of a different cause of the re-bleeding and, ultimately, death.

The defense, in its closing argument, recognized that appellant would be responsible for any re-aggravation of the bat injury caused by Teresa. As a result, the defense theory was that appellant, contrary to his oral confession under oath, did not hit or strike Timmy on either Friday or Sunday prior to Timmy's admission to the hospital.

The military judge admonished the Government not to use the missing evidence to impeach the defense expert, and he provided

a limiting instruction at the close of the arguments.  The judge instructed the members that they were prohibited from giving less weight to the defense expert's testimony solely because he had not had the opportunity to view or test the lost evidence.  Further, the members were instructed that they could consider Dr. Odom's opinion as to "what he expected the microscopic examination to show even though the brain and its meninges were not available for [his] examination."  54 MJ at 970-71.

Notwithstanding the military judge's remedial efforts, trial counsel attacked the credibility of Dr. Odom by emphasizing that he had not examined the lost brain and meninges.  There was no objection.  Additionally, trial counsel's closing argument attempted to enhance the credibility of Dr. Arruza by emphasizing that she had access to the lost evidence and, in fact, had done a comprehensive exam.  Again, there was no objection.  We need not decide, however, whether the military judge's failure to promptly correct or temper trial counsel's remarks was plain error because any error was harmless beyond a reasonable doubt in light of appellant's confession.

"[A] voluntary confession of guilt is among the most effectual proofs in the law, and constitutes the strongest evidence against the party making it that can be given of the facts stated in such confession."  Hopt v. Utah, 110 U.S. 574,

584 (1884).  "A deliberate, voluntary confession of guilt is among the most effective proofs in the law."  United States v. Monge, 1 USCMA 95, 97, 2 CMR 1, 3 (1952).  As the Supreme Court recently reiterated:

> A confession is like no other evidence.  Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . .  Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.

Arizona v. Fulminante, 499 U.S. 279, 296 (1991)(citations omitted).  Thus, appellant's confession goes far in rendering harmless any error in the military judge's failure to give an adverse inference instruction or stop trial counsel from commenting on the defense's inability to examine Timmy's brain and meninges.

Of course, this assumes appellant's confession is reliable. False voluntary confessions do exist, and when their reliability is called into question, so too is their otherwise overwhelming power to prove the declarant's guilt.  Moreover, the factual question whether a confession is reliable is for the members of a court-martial to decide.  See Mil.R.Evid. 304(e)(2), Manual, supra (once military judge finds confession voluntary as a matter of law and admits it, members determine its voluntariness and reliability as a matter of fact); Jackson v. Denno, 378 U.S. 368, 387 n.13 (1964).

17

The question in this case, then, is whether there is a reasonable likelihood the members would have found appellant's confession was involuntary or unreliable had the military judge given an adverse inference instruction relating to the lost brain and meninges, and stopped trial counsel from commenting on the defense's inability to examine them. This question arises for the following reasons.

Prior to trial, appellant confessed to brutally beating Timmy on June 2 and 4. At trial, however, the defense denied the beatings on these dates, maintained the confession was fabricated, and argued the cause of Timmy's death was his sister hitting him on the head with a baseball bat three weeks earlier, or possibly Timmy's self-abusive, head-banging behavior. In support of this theory, a defense expert testified that the three-week old baseball bat injury was the cause of Timmy's death, not injuries sustained on June 4, as the Government's expert concluded.

The defense expert, however, was unable to examine Timmy's brain. Such an examination may have strengthened his conclusion that the baseball bat injury, not June 4 injuries, was the cause of death. This, in turn, may have been viewed by the members as consistent with appellant's trial position of a fabricated

18

confession, thereby decreasing the voluntariness or reliability of his confession in their minds.

Similarly, had the military judge given the adverse inference instruction and stopped trial counsel from commenting on the defense's inability to examine the brain, the voluntariness or reliability of appellant's confession might also have been questioned by the members. The presence of the requested instruction and absence of prohibited comments could have put the defense in a position similar to the one it would have occupied had the brain not been lost, a position which, as stated above, might have produced a question in the members' minds about the voluntariness or reliability of appellant's confession.

Nonetheless, for the reasons that follow, we conclude there is no reasonable likelihood the members would have found appellant's confession was involuntary or unreliable, even if the military judge had given the adverse inference instruction and stopped trial counsel from making prohibited comments

At the time of Timmy's autopsy, he had multiple injuries around his eyes, his cheek, his jaw, his neck, his lips, the left side of his chest, his lower left hip, his right forearm, the right and left sides of his knees, and the right and left sides of his lower legs. Given the magnitude and variety of

these injuries -- <u>injuries separate and apart from Timmy's brain</u> <u>injury</u> -- there is simply no way the members could conclude they were caused by a single hit to the head with a baseball bat three weeks earlier, or by less traumatic, self-inflicted head-banging.

On this record, the only thing the members could conclude, <u>even with the requested adverse inference instruction and</u> <u>without trial counsel's questionable comments</u>, was that the multiple injuries Timmy sustained over his face and entire body, independent of his brain injury, had to be caused by the June 2 and 4 beatings described by appellant in his detailed confession, assaults that included numerous hits to the face, grabbing and dragging by the extremities, a full-body knock into a wall, and a full-body fall to the floor from several feet up.

Furthermore, the members were properly instructed on their role in determining the voluntariness and reliability of the confession and that they could not give less weight to the defense expert's testimony simply because he did not examine the brain, and we assume they did not. See <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987)("invariable assumption of the law that jurors follow their instructions"). In this context, we hold that appellant's voluntary, reliable, detailed confession, admitting far more than needed to shield his wife from

prosecution, rendered harmless beyond a reasonable doubt any error in the military judge's failure to give an adverse inference instruction or stop trial counsel from making prohibited comments related to the missing brain.  See United States v. Moolick, 53 MJ 174, 177 (2000).

It is important "to distinguish between the discrete issues of voluntariness and credibility...."  Jackson, 378 U.S. at 387 n.13.  There is no question but that appellant's confession was voluntary as a matter of law, for the reasons set forth in the first part of this opinion.  Here, we conclude that by focusing on Timmy's other injuries, in addition to his brain injury, the members could not help but find appellant's confession was also voluntary and reliable as a matter of fact.

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

United States v. Ellis, No. 01-0590/NA

SULLIVAN, Senior Judge, (concurring in part and in result):

Nearly fifty years ago, Justice Sherman Minton observed that "[a] defendant is entitled to a fair trial but not a perfect one." Lutwak v. United States, 344 U.S. 604, 619 (1953). In this case it would have been better had the medical examiner's staff not discarded the victim's brain and its coverings; however, this evidence was not "apparently exculpatory" at the time it was discarded. See United States v. Garries, 22 MJ 288, 292-93 (CMA 1986); United States v. Kern, 22 MJ 49 (CMA 1986). Also, there was no bad faith in the loss of this potential evidence. See United States v. Gomez, 191 F.3d 1214, 1218-19 (10th Cir. 1999); Holdren v. Legursky, 16 F.3d 57, 60 (4th Cir. 1994); State v. Graham, 454 S.E. 2d 878, 880-81 (N.C. App. 1995). Moreover, loss of the tissue samples did not deny appellant the ability to present a defense based on his theory of the case. See Appellate Exhibit LXI (Military Judge's Ruling on Motion). In these circumstances, I am satisfied that appellant received a fair trial as provided in our Constitution. See Arizona v. Youngblood, 488 U.S. 51, 60 (1988)(Stevens, J., concurring).

I also agree with the lead opinion that appellant's confession to injuring the victim was voluntary. The detectives investigating this case did comment to appellant that if he and his wife were apprehended for inflicting the injuries leading to

1

the victim's death, their children would be placed by Department of Human and Rehabilitation Services in foster care.  This was a correct statement of fact as to the procedure in Florida; nor was the threat to arrest appellant's wife a bad-faith attempt or pretext to extract a false confession from appellant.  As such this statement should not be the basis for excluding appellant's confession.  See Henson v. Commonwealth, 20 S.W.3d 466 468-69 (Ky. 1999); see also Johnson v. Trigg, 28 F.3d 639, 644-45 (7th Cir 1994).

Appellant did not make any admissions at the time this statement was made.  It was not until several hours later, and after he had spent about 20 minutes in conversation alone with his wife, that he implicated himself in these offenses.  Moreover, there was no evidence that the police had placed improper pressure on appellant's wife to force him to confess.  Cf. United States v. Borodizik, 21 USCMA 95, 44 CMR 149 (1971).  Thus, the detective's statement, neither standing alone nor in connection with other events occurring during the interview, sufficed to overbear appellant's will.  Cf. Columbe v. Connecticut, 367 U.S. 568 (1961).

A final issue in this case is whether the military judge erred by failing to take remedial steps to protect appellant from unfair prejudice at trial resulting from the inadvertent loss of these items of potential evidence.  See R.C.M.

703(f)(2), Manual for the Courts-Martial, United States (1994 ed.).  Although the military judge concluded that the lost evidence was not essential to a fair trial, he did take steps to protect against the government "unfairly bolstering" its case on this basis.  See R.C.M. 801(a)(3), Manual, supra (Power of trial judge to ensure rules are complied with).  Cf. United States v. Manuel, 43 MJ 282 (1995).  Appellant complains that these measures were inadequate.

Initially, I note that the trial judge in this case denied the defense's request to give an adverse inference instruction against the Government as a result of the loss of the brain materials.  An adverse inference instruction, where the lost evidence was not discarded in bad faith, is not warranted.  See United States v. Artero, 121 F.3d 1256, 1259-60 (9th Cir 1997); United States v. Jennell, 749 F.2d 1303, 1308-09 (9th Cir 1984); See generally 2A Charles Allen Wright, Federal Practice and Procedure § 489 at 412-19 (3d ed. 2000).  Accordingly, the military judge did not err in failing to give the defense requested instruction.

Nevertheless, the military judge did allow the admission of the defense expert's testimony in this case and instructed trial counsel to refrain from impeaching the defense expert on the basis of his inability to examine the brain coverings. Appellant has not persuaded me that these measures were legally

3

United States v. Ellis, No. 01-0590/NA

inadequate.  See generally United States v. McElhaney, 54 MJ 120, 129 (2000).  Admittedly, trial counsel may have violated the military judge's protective order in attempting to impeach the defense expert with his pre-trial investigation testimony which was predicated on this expert's failure to examine the lost evidence.  However, the trial judge's final instructions to the members cured any error resulting from his failure to immediately enforce his protective order.  See United States v. Meeks, 35 MJ 64, 69 (CMA 1992)(Military Judge's instructions preclude any possibility of prejudice).

4

BAKER, Judge (concurring in the result):

I agree with Judge Effron's factual recitation and legal framework for addressing the relationship between Issue I and Issue II; however, I join the conclusion in the lead opinion that appellant's statement was voluntary and any error by the military judge in failing to provide an appropriate remedy in view of the lost evidence was harmless.

Although I agree with the result reached in the lead opinion, I write separately to address concerns I have about the way the result is reached. On Issue I, the majority opinion fails to capture or acknowledge the potentially coercive effect a threat to deprive parents of their access and rights to their children may have on their custodial confessions. I believe that such threats carry with them an increased risk that parents may confess involuntarily; and as such, courts must review the confessions rendered under such threats with heightened sensitivity. With respect to Issue II, I do not join the apparent conclusions in the lead opinion regarding the mental processes of the members. While I agree that any error was harmless, I am not prepared to step into the shoes of the members and state with certainty what members were, or were not, prepared to consider and just how reliable and voluntary they might have found appellant's confession to be. Moreover, the lead opinion relies on a factual theory involving review of

medical evidence that was not presented to the members.
Nonetheless, I am confident there was no reasonable likelihood
that any error by the military judge affected the findings.
Therefore, for the reasons stated below, I agree to affirm.

I.

The Supreme Court has recognized that "[v]ery few people
give incriminating statements in the absence of official action
of some kind."  Schneckloth v. Bustamonte, 412 U.S. 218, 224
(1973).  It has also recognized that "custodial police
interrogation, by its very nature, isolates and pressures the
individual," Dickerson v. United States, 530 U.S. 428, 435
(2000), and that it "trades on [his or her] weakness[es]."
Miranda v. Arizona, 384 U.S. 436, 455 (1966).  Nevertheless, the
Court has also held that "certain interrogation techniques,
either in isolation or as applied to the unique characteristics
of a particular suspect, are so offensive to a civilized system
of justice that they must be condemned under the Due Process
Clause of the Fourteenth Amendment."  Miller v. Fenton, 474 U.S.
104, 109 (1985).  Whether interrogation tactics are coercive and
exceed constitutionally permissible limits is determined by
looking at the totality of the circumstances in each case.
Haynes v. Washington, 373 U.S. 503, 513 (1963).

In this case, the civilian police officers sought to trade
upon and exploit any emotional ties appellant might have to his

2

six surviving children.  The critical question for purposes of this appeal therefore is:  Did the police exceed permissible conduct in doing so?

For love of children parents will do many things that escape the bounds of common sense or elude concepts of natural law.  But as this case illustrates, some parents are also capable of abhorrent criminal conduct toward their children.  The law has not heretofore provided a per se prohibition on police officers discussing the fate of a suspect's children during interrogation.  Nor should it.  The fate of such children may be relevant to the offense, a necessary by-product of the criminal process, or, indeed, may serve as a source of lawful police leverage and a truth-finding vehicle.  However, given the complex emotional ties between parent and child, such interrogation methods will present inherently close and contextual questions as to whether any subsequent statement is indeed voluntary.  This is why a "totality of the circumstances" test is used.  Law enforcement officers, and the courts that review their actions, must proceed with heightened sensitivity to test the validity of any confession given subsequent to a discussion relating to an accused's family members, to ensure that police conduct does not offend justice.  Such care was taken in this case.

Both the military judge and the Court of Criminal Appeals
concluded that appellant's recorded statement occurred after he
received and voluntarily and intelligently, waived his Miranda
rights.  54 MJ 958, 967 (2001).  These rights, and appellant's
waiver of them, were reaffirmed prior to appellant's confession.
The officers surely hoped to pressure appellant or his wife into
confessing, but they did not badger him, scream at him,
otherwise bully him down this path, or discourage or impede the
exercise of his rights.  While appellant no doubt felt pressure
to confess, the length and content of the interrogation was not
overbearing.  The statements concerning the fate of appellant's
children were certainly within the realm of possibility.
Appellant's confession followed a meeting with his wife rather
than just after his time with the police.  Furthermore, as
pointed out in the lead opinion, the confession itself admitted
far more, in terms of the number of incidents, the provocation
for the incidents, and the level of brutality, than would have
been required for appellant to protect his wife from prosecution
by falsely confessing.  According to the court below:

> The appellant admitted to the detective that, on 2
> June 1994, he struck Timmy in the face and then grabbed the
> child's head and pounded it on the shower floor several
> times after Timmy defecated in his pants and started
> playing with the feces.  Detective Robinson left the room
> and returned with Sergeant Japour.  The appellant was
> advised that his admission was inconsistent with the
> medical evidence pointing to a more recent injury.  The
> appellant then admitted that he had also assaulted Timmy on

> 4 June 1994.  He stated that he became very angry because the child would not eat his breakfast and was picking again at a sore inside his lip.  So, he stood the child on a small picnic table in the family garage and struck him with sufficient force to knock him to the ground.  The appellant then grabbed the child by the head and pounded it several times against the cement floor.

Id. at 960.

Finally, given the totality of all these circumstances the military judge put the context and veracity of appellant's confession squarely before the members.[1]  In short, the military

---

[1]In his instructions regarding appellant's audiotaped confession, the military judge admonished the members, inter alia, as follows:

> It is for you to decide the weight or significance, if any, the accused's pretrial statement deserves under all the circumstances.  In deciding what weight or significance, if any, to give the accused's statements, you may consider that evidence has been introduced that certain police interrogation techniques were employed during the initial interview and accusatory interview of the accused and that Detective Hickson made comments to the accused and Lauri Ellis concerning the probable involvement of HRS in the removal of the children from the Ellis' home if both the accused and Lauri Ellis were arrested.

> You should consider the testimony of the witnesses concerning the taking of the statement, including their demeanor in the courtroom and how their testimony is either consistent or inconsistent with the prior statements they may have given.  You should consider the environment in which the interviews and the statements were taken, including the physical layout of the spaces and whether rights advisements were given to the accused.  Additionally, you should consider any evidence that you believe either corroborates or contradicts the matters asserted by the accused in his pretrial statement.  You may also consider the accused's tone of voice and demeanor evidenced in Prosecution Exhibit 3.

> I want to be very clear.  These examples of the type of evidence you may consider in determining what weight you wish to give to the accused's pretrial statement, in determining the truth or falsity of the statement, are illustrative only.  You are at liberty to consider all of the evidence in the case that relates to the credibility of the accused's pretrial statement in determining the weight and significance, if any, you want to give it.  In determining this matter, you are permitted to use your own common sense and knowledge of human nature.

judge and the CCA addressed this confession with the caution and care required.  Their findings of fact are not clearly erroneous.  Reviewing the lower courts' application of law to facts de novo, I reach the same legal conclusion as that in the lead opinion, and the court below -- appellant's confession was voluntary.

## II.

The military judge sought to address the missing evidence in three ways.  First, after hearing evidence on the defense motion for relief, the military judge ruled that the Government could not argue to the trier of fact that its expert's opinion merited more weight because only she had the opportunity to personally observe the brain and surrounding tissue during the autopsy.  Second, he ruled that the prosecution could neither direct questions, nor cross-examine witnesses, where the intended or probable response would imply that the Government witness' opinion was of greater weight simply because of her unique opportunity to make certain observations during the autopsy.  Finally, at the close of the case on the merits, the military judge instructed the members (1) that they were prohibited from drawing an inference adverse to the weight of the defense expert's testimony solely because he had not had the opportunity to personally view or test the lost evidence, and

6

(2) that they could consider the defense expert's opinion as to what he expected a microscopic examination to show even though the brain and mininges were not available for his examination.

Appellant contends that in at least three instances the trial counsel undermined the reliability of the defense expert's opinion by emphasizing during cross-examination that Dr. Charles Odom had not examined the brain and dura. During the cross-examination of Dr. Odom, the trial counsel attempted to attack Dr. Odom's conclusion that he was confident to a reasonable medical certainty that the child's fatal injury occurred some two to three weeks before June 4. He attempted to impeach the doctor with his testimony from an earlier court session pursuant to Article 39(a), UCMJ, 10 USC § 839(a), during which the doctor had indicated that without the ability to microscopically examine some tissue visible in one of the autopsy photographs, he was not willing to stake his reputation on his conclusion regarding the date of the injury. As a result, appellant argues that the trial counsel violated the military judge's rulings and that the judge's subsequent instruction regarding the defense expert's testimony was an inadequate remedy. In appellant's view, an adverse inference instruction was required.

In my opinion, the military judge provided an adequate remedy for the missing evidence by admonishing the Government

not to use the missing evidence to impeach the defense expert and by giving the members a limiting instruction at the close of arguments.  Arguably, error occurred when trial counsel nonetheless sought to impeach the defense expert on the ground that he had not examined the missing brain tissue depicted in one of the photographs, and the military judge did not take immediate corrective action.  However, even if one concludes that the instruction did not cure the error, it factors into the harmless error analysis.

Both the government and defense experts agreed that microscopic examination of the skull could narrow the timeframe of the injury.  54 MJ at 970.  Dr. Margarita Arruza, the government expert, testified that her examination of the brain tissues placed the date of injury on June 4, not three weeks earlier as asserted by the defense.  She concluded, based on a microscopic examination of the skull two and a half years after performing the autopsy, that the skull had been fractured twice, with the newest injury being four days old at the time of death. The defense expert, Dr. Odom, disagreed, testifying that his microscopic examination of the skull showed that the fatal injury was inflicted approximately three weeks prior to death.

If the adverse inference instruction had been given, the members would have been permitted, but not required, to infer that the lost brain tissues would have supported the defense

theory that the injuries were inflicted three weeks before death. The adverse inference instruction would have applied only to the lost brain tissues, not to the examination of the skull. The panel would still have been presented with competing expert views regarding examination of the skull. This in turn would diminish the importance of expert testimony and increase the importance of appellant's confession.

As the lead opinion rightly states, appellant bore a heavy burden in attempting to persuade members that his confession was a false product of unlawful police pressure. As the Court stated in Arizona v. Fulminante, a voluntary and corroborated confession "is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . ." 499 U.S. 279, 296 (1991). As noted above, appellant's confession was particularly damaging. It was specific, graphic, and consistent with the Government's theory of the case. It also went well beyond what was necessary to absolve appellant's wife, or end a police interview of insignificant duration and lacking of duress. As a result, I am confident that if there was error regarding the military judge's instruction to members, there was no reasonable likelihood it affected the findings.

EFFRON, Judge (dissenting):

The lead opinion concludes that appellant's confession was voluntary as a matter of law. The lead further concludes that the confession may be relied upon to render harmless any error resulting from the failure of the military judge to provide an appropriate instruction regarding the destruction of important evidence. I respectfully disagree. The focus in the lead opinion on the admissibility ruling of the military judge fails to take into account the difference between: (1) the role of the military judge in determining admissibility of a confession as a matter of law, and (2) the role of the court-martial panel in assessing the voluntariness and corroboration of a confession as a matter of fact.

The military judge in the present case erred in failing to appropriately instruct the members regarding the adverse inference that may be drawn from the destruction of the brain and meninges. That instruction was directly related to the evidence relied upon by the prosecution to buttress and corroborate appellant's confession.

In the state court proceedings that preceded appellant's court-martial, the trial judge and the appellate court concluded that the confession was inadmissible. See 54 MJ 958, 969

(2001). Even if the military judge ruled correctly that the confession was voluntary as a matter of law, the evidence in this case raised substantial doubts about the reliability of the confession – a matter in which the ultimate decision rests with the court-martial panel, not the military judge. See Mil.R.Evid. 304(e)(2), Manual for Courts-Martial, United States (2000 ed.). Moreover, the prejudicial impact of the failure to instruct was compounded when the military judge failed to sustain defense objections to the Government's use of the destroyed evidence, both to bolster the credibility of its expert witness and undermine the credibility of the defense expert. In light of the concerns raised by these errors, I cannot be confident that a properly instructed panel would have concluded that the confession was sufficiently reliable and corroborated to support a finding of guilty beyond a reasonable doubt.

## I. Background

### A. The Confession

Appellant's family consisted of his wife and seven children, including Timothy (Timmy) Ellis, Jr., appellant's two-and-a-half-year-old son from a prior marriage. On June 4, 1994, appellant's wife brought Timmy, who was unconscious, to the Naval Hospital in Jacksonville, Florida. He was transferred to

the University of Florida Medical Center in Jacksonville, where he died four days later.

After considering information from the initial autopsy, Detective Anthony Hickson, of the Jacksonville Sheriff's Office, Homicide Division, suspected that the death was a homicide resulting from child abuse. At his request, appellant and appellant's wife came to the Jacksonville Sheriff's Office on June 10. After they arrived at 11:00 a.m., they were interviewed in separate locations. Although they were not allowed to move about the office area unless accompanied by an escort, they were not placed in locked rooms or in handcuffs, nor were they told explicitly that they could not leave.

Based upon the initial interviews, Detective Hickson concluded that Timmy had been in the sole care of appellant and his wife before he was brought to the hospital. He also concluded that neither appellant nor his wife had provided a satisfactory explanation for Timmy's injuries. At that point, Detective Hickson decided to proceed with separate accusatory interviews. Appellant and his wife, who were separately provided with Miranda warnings, each waived the privilege against self-incrimination as well as the right to consult with counsel.

As described by the Court of Criminal Appeals, Detective Hickson, in the separate interrogations of appellant and his wife, first "informed each of them that he believed there was probable cause to arrest both of them for child abuse." 54 MJ 959, 960. Next, he "indicated that, if both of them were arrested, their other six children would probably be removed from their home by officials from the Department of Human and Rehabilitative Services . . . and temporarily placed in foster care." Id.

Both appellant and his wife denied any pertinent knowledge. Appellant's wife, who was interviewed first, also asked to speak to appellant. That request, which was denied initially, was granted after his interrogation in the hopes that it would lead to further information. After meeting with his wife for about 15 minutes, appellant indicated that he wanted to talk. He made a confession that was taped and transcribed, and which included an admission to a series of severe attacks on Timmy on June 2 and June 4.[1]

Appellant was prosecuted for his son's death in state court in June 1995. The trial judge granted appellant's motion to

---

[1] Appellant confessed to attacking his son twice by slamming the child's head against the ground, first on June 2, against the tile floor in the bathroom, and a second time on June 4, against the concrete garage floor. In the present case, the Government took the position each confession was true, and charged appellant with committing both acts.

4

suppress his confession, the ruling was sustained on appeal, and
the state terminated the prosecution. See id. at 969. In April
1996, military charges were preferred against appellant for the
same offense, and were referred to trial in July 1996. See
Bartkus v. Illinois, 359 U.S. 121 (1959)(permitting state trial
after federal court acquittal for same conduct); R.C.M.
907(b)(2)(C), Manual, supra (motion to dismiss based on former
jeopardy limited to prior court-martial or federal civilian
court proceedings).

At the court-martial, appellant sought to suppress his
statement on the grounds that it was involuntary. With respect
to the present appeal, the pertinent aspect of appellant's
motion involved the question of whether his will was overborne
by Detective Hickson's statement that the police had probable
cause to arrest him and his wife, and that if they both were
arrested, their other children would be placed in foster homes
by the Department of Human and Rehabilitative Services. After
receiving evidence from both the prosecution and defense, the
military judge concluded that the prosecution had met its burden
of proving that the confession was voluntary by a preponderance
of the evidence, and ruled that the confession was admissible.
With respect to Detective Hickson's statements to appellant and
his wife about removing the children to foster homes, the

5

military judge ruled that these remarks did not constitute either a threat or an improper promise, but served merely as an appeal to speak the truth. See id. at 963. The Court of Criminal Appeals found that although Detective Hickson's reference to Department of Human and Rehabilitative Services could be "reasonably construed as an implied threat directed at the couple's other children," it did not cause appellant to confess against his will. 54 MJ at 968.

The defense vigorously challenged the voluntariness of the confession and asked the members to disregard it as unreliable and uncorroborated by the medical evidence. In support of the corroboration requirement, the prosecution relied on the disputed expert testimony. See Mil.R.Evid. 304(g), Manual, supra. The military judge instructed the members that it was their responsibility to determine whether the confession was voluntary and whether it was sufficiently corroborated.

## B. Destruction of Critical Evidence

On June 9, the day after the victim died, an autopsy was performed by Dr. Margarita Arruza, an Associate Medical Examiner in the Jacksonville Medical Examiner's Office. She concluded that the death was the result of an injury on June 4, that was not accidental. During the course of the examination, she

removed the brain and its meninges from the cranium.  She sliced the brain and made a visual inspection of the material at various depths to check for infarcts -- areas of dead tissue resulting from prolonged deprivation of blood.  She concluded that there were none based on her unaided visual inspection, but did not conduct a confirmatory microscopic examination of the tissue. See 54 MJ at 969.

Following the autopsy, Dr. Arruza arranged for storage of the brain and its meninges pursuant to a laboratory regulation providing that specimens be maintained for at least one year.  Several months later, however, the specimen container was inadvertently discarded when the laboratory was moved to a new location.  See id.

At trial, appellant moved to dismiss the charges, citing R.C.M. 703(f)(2), Manual, supra, which provides, in pertinent part, with respect to evidence that has been destroyed or lost:

> [I]f such evidence is of such central importance to an issue that is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to produce the evidence or shall abate the proceedings . . . .

Appellant also relied upon the right to present a defense under the Fifth Amendment, the right to cross-examine witnesses under

the Sixth Amendment, and the right to obtain witnesses under Article 46, UCMJ, 10 USC § 846. See 54 MJ at 969.

Appellant contended that the missing evidence was central to both parties, noting that the prosecution would rely on testimony about the brain tissue to establish the time of death, and the defense would rely on scientific examination of the brain to impeach the Government's expert witnesses and to establish a defense theory as to the time and cause of death. The defense theory of the case was that the injuries had been inflicted by a baseball bat wielded by appellant's daughter several weeks earlier, or by Timmy's self-abusive head-banging behavior. See id. at 969-70.

Before ruling on the motion, the military judge received testimony from the prosecution's expert, Dr. Arruza, and the defense expert, Dr. Charles Odom, a medical examiner with the Dallas County (Texas) Medical Examiner's Office. As summarized by the Court of Criminal Appeals:

> Both experts agreed that a microscopic examination of the missing evidence, particularly the meninges, could have pinpointed the approximate timeframe of when the injury occurred. But they agreed, too, that a microscopic examination of the skull fracture, which was preserved, and available for defense examination could also help to narrow down the timeframe of the injury.

54 MJ at 970. The military judge denied the defense motion,
ruling that the defense had failed to meet its burden in terms
of showing that the missing evidence was apparently exculpatory
and that comparable evidence was not reasonably available. See
id. (applying the constitutional test set forth under California
v. Trombetta, 467 U.S. 479, 489 (1984)). To address the problem
caused by the loss of the evidence, the military judge also
ruled that the prosecution could not state or infer that because
Dr. Arruza had the opportunity to examine the missing tissue,
her testimony should be given more weight than testimony of the
defense experts. See id.

During the prosecution's case-in-chief, Dr. Arruza
testified that her gross examination of the child's skull and
the missing tissues placed the date of injury at June 4, and
stated that she had believed a microscopic analysis would lead
to the same result. Dr. Arruza further testified that she
conducted a microscopic examination of the fracture two and a
half years after performing the autopsy, and determined that she
had misdated the fracture, and that it was actually three to six
weeks old. However, Dr. Arruza concluded the skull had been

refractured and the new injury was consistent with being four days old.[2]

The defense expert, Dr. Odom, testified that his unaided visual observation of the skull indicated that it had been fractured approximately three weeks prior to death, and that his opinion was confirmed when he microscopically examined the skull. Based on his examination of the skull fracture, medical records, and autopsy photographs taken of the destroyed brain evidence, Dr. Odom concluded that Timmy's death was caused by a subacute subdural hematoma -- a blood clot in the space between the brain and dura -- which had began to liquify and re-bleed, causing irritation to, and swelling of, the brain. Dr. Odom further stated that the subacute subdural hematoma was two to three weeks old at the time of death. He added that he would have expected a microscopic examination of the missing brain tissue to confirm his gross observations had he been able to conduct such an examination.

During cross-examination, trial counsel repeatedly challenged the reliability of Dr. Odom's testimony by obtaining an acknowledgment from Dr. Odom that he would not stake his

---

[2] Dr. Arruza conducted the microscopic examination of the skull, at the request of the defense, after learning the defense expert, Dr. Odom, had determined the fracture was three weeks old by gross examination of autopsy pictures of the skull specimen.

professional reputation on his analysis of the timeframe in the absence of a microscopic examination of the missing tissue. During closing argument, trial counsel returned to this theme, suggesting to the members that they could not rely on Dr. Odom's testimony because "he is evidently not one to stake his reputation on it[.]"  Trial counsel urged the members to reject the defense theory based on Dr. Arruza's testimony that "she did not see any evidence of a subacute or chronic subdural hematoma[,]. . . that such evidence would be visible on inspection, and she didn't see it."  The military judge did not sustain defense counsel's objection to the prosecution's exploitation of the missing evidence.

With respect to the missing evidence, the military judge instructed the members that they could not give less weight to the testimony of Dr. Odom solely because he did not have the same opportunity as Dr. Arruza to examine the missing specimen. He also stated that they could consider Dr. Odom's opinion as to what he would have expected the microscopic examination to show, even though the specimen was unavailable.

Defense counsel asked the military judge to address the harm caused by the missing evidence by giving an adverse inference instruction, permitting the members to infer a fact against the Government's interest if the Government lost or

destroyed evidence whose content or quality was at issue.  Such
an instruction would have permitted, but not required, the
members to draw an inference against the Government's theory of
the time of death.  The military judge declined to give the
requested instruction.

## II. Discussion

### A. The Confession

As the lead opinion notes, a confession may not be
introduced against the accused unless it was provided
voluntarily, U.S. Const. amend. V; Article 31(d), UCMJ, 10 USC
§ 831(d), a determination which is based upon the totality of
the surrounding circumstances.  Schneckloth v. Bustamante, 412
U.S. 218, 226 (1973).  Statements by law enforcement officials
about consequences for family members may render a statement
involuntary, depending on the totality of the circumstances.
Compare Lynumn v. Illinois, 372 U.S. 528, 534 (1963)(confession
deemed involuntary when police advised defendant that if she did
not cooperate, state financial aid for the children would be
terminated and the children would be taken from her), with
United States v. Moreno, 36 MJ 107, 112 (CMA 1992)(confession
not involuntary when made to a social worker, who was not part
of a law enforcement investigation, when appellant faced choice
between cooperating with a social worker, or not cooperating and

12

facing a greater risk of losing his children).  We specifically recognized in Moreno that other "circumstances involving threats, promises, or other inducements" could "raise questions of the voluntariness of an accused's statements to a social worker or other similarly situated person."  Id.  In general, the courts have approached such cases with a focus on the facts of each individual case.  In a number of cases, the courts have determined that the facts rendered a confession involuntary. See, e.g., United States v. Tingle, 658 F.2d 1332 (9th Cir. 1981); Hall v. State, 266 N.E.2d 16 (Ind. 1971); People v. Rand, 21 Cal. Rptr. 89 (Cal.Ct.App. 1962).  In other cases, the courts have determined that the facts did not amount to unlawful coercion.  See, e.g., United States v. Murray, 45 MJ 554 (N-M. Ct. Crim. App. 1996); United States v. Vandewoestyne, 41 MJ 587 (A.F. Ct. Crim. App. 1994).

In the present case, the law enforcement officials discussed placing the couple's children in foster homes for a specific purpose -- "to pressure them into providing additional information as to the cause of Timmy's" death.  See 54 MJ at 968.  They did not raise the specter of removing the children for a beneficial or neutral purpose.

Under these circumstances, the case presents a very close question as to whether appellant's confession was involuntary –

13

whether he confessed not because he was guilty, but rather, to assume the sole blame, thereby exonerating his wife so that the children could remain with her.  In the state court proceedings against appellant, the trial judge ruled that the confession was inadmissible, and that ruling was sustained on appeal; however, the military judge and the Court of Criminal Appeals came to a different conclusion.  Assuming, without deciding, that the judicial rulings in the present case were correct as a matter of law, such rulings do not resolve the issue of whether the confession was reliable -- an issue committed by law to the members of the court-martial panel under Mil.R.Evid. 304(e)(2), Manual, supra.  See also Crane v. Kentucky, 476 U.S. 683 (1986).  The closeness of the question as to the reliability of the confession is highly relevant to the issue considered next -- whether any error by the military judge in fashioning a remedy for the missing evidence was harmless beyond a reasonable doubt.

## B. Destruction of Critical Evidence

The primary rule at issue in this case is R.C.M. 703(f)(2), Manual, supra, which governs the relief a party may seek when evidence that is of "central importance to an issue" is "destroyed, lost, or otherwise not subject to compulsory process."  The applicable precedent interpreting R.C.M. 703(f)(2) is United States v. Manuel, 43 MJ 282, 288 (1995), in

which we concluded that in R.C.M. 703(f)(2), the President granted safeguards to a military accused beyond the minimal requirements required by Article 46, UCMJ, or by the Constitution under Trombetta.  The rule does not include a requirement to show that the evidence was lost or destroyed as a result of the Government's bad-faith.  We emphasized that the "rule gives the court discretion to fashion an appropriate remedy if lost evidence is of such central importance to an issue that is essential to a fair trial."  Manuel, 43 MJ at 288 (emphasis and internal quotations omitted).  The question before us is whether the military judge in this case fashioned an appropriate remedy.

In the present case, there was substantial prejudice to the rights of the accused as a result of the destruction of the evidence.  The central issue at trial was the time of the injury that caused Timmy's death.  The prosecution endeavored to show that the injury occurred four days before death.  The defense expert testified that the injury likely occurred three weeks before death.  The military judge permitted the prosecution to attack the credibility of the defense expert by emphasizing the fact that the expert had not examined the missing specimen.  As a result, the military judge significantly diminished the effect of his prior remedial ruling which, in order to cure any

prejudice to the defense resulting from the destruction of the brain evidence, had prohibited such questioning.

The military judge also permitted trial counsel in closing argument to bolster the credibility of the government's expert by emphasizing her access to, and examination of, the missing specimen. In addition, the military judge denied repeated defense requests for an adverse inference instruction. Even if the initial ruling of the military judge denying the motion to dismiss was correct, the subsequent proceedings reflected a failure to take appropriate corrective action to remedy the problems posed by the destruction of this critical evidence.

## C. Harmless Error Analysis

The military judge had a number of remedial actions available to address the problem of the missing evidence, to include an adverse inference instruction. The record, however, contains defense requests for both an adverse inference instruction and other relief, and the military judge's denials. If the military judge did not wish to phrase the instruction precisely as proposed by the defense, he was obligated under R.C.M. 703(f)(2) and Manuel to give an appropriate instruction, which he did not do. Moreover, the military judge further erred by failing to sustain defense objections to trial counsel's improper argument.

16

United States v. Ellis, No. 01-0590/NA

The lead opinion concludes that any errors in this case were rendered harmless by the admission of appellant's confession.  I respectfully disagree.

A military judge's ruling on the voluntariness of a confession as a matter of law does not answer the question as to its truthfulness as a matter of fact.  "A [trial judge's] finding that the confession is voluntary prior to admission no more affects . . . the jury's view of the reliability of the confession than a finding in a preliminary hearing that evidence was not obtained by an illegal search affects . . . the jury's view of the probativeness of this evidence."  Jackson v. Denno, 378 U.S. 368, 386 n.13 (1964); see also Mil.R.Evid. 304(e), Manual, supra; United States v. Meade, 20 USCMA 510, 513, 43 CMR 350, 353 (1971).

If a reviewing court finds that there is an error at trial, that error cannot be deemed harmless by reliance on a confession that has been challenged on voluntariness grounds before the members without first considering the impact, if any, of the error on the members' determination of the confession's actual truth.  Mere admission of a confession does not establish its reliability.  See, e.g., Mil.R.Evid. 304(e)(2); Crane, 476 U.S. at 689.  In the present case, there are three theories, based upon the prosecution's evidence and arguments at trial, under

17

which the members could have convicted appellant: (1) the members concluded that appellant's confession and the prosecution's expert testimony were both credible and permitted a finding of guilty beyond a reasonable doubt; (2) the members concluded that although the confession was unreliable, the prosecution's expert testimony permitted a finding of guilty beyond a reasonable doubt; or (3) the members concluded that the confession was credible, and the prosecution's expert testimony was not sufficiently credible on its own to permit a finding of guilty beyond a reasonable doubt but was sufficient to corroborate appellant's confession.

We have no way of knowing which theory was employed by the members to convict appellant. What is significant on appeal is that each theory relies on the testimony of the prosecution's expert, Dr. Arruza. The prosecution did not present other independent evidence of appellant's guilt. See 54 MJ at 970 ("The Government maintained that the medical evidence would corroborate . . . appellant's admission that he had fatally injured his son on 4 June 1994"). Accordingly, any harmlessness analysis must consider the impact on the members' ultimate credibility determinations flowing from trial counsel's improper use of the missing evidence to bolster Dr. Arruza's testimony, and undermine the credibility of the defense expert, Dr. Odom.

18

Similarly, we must consider the impact of the military judge's failure to give an adverse inference instruction.

The lead opinion assumes that there is a fourth theory under which the members could have convicted appellant. The opinion is based on the assumption that the members disregarded the expert testimony concerning the time of death derived by the Government's expert from the missing evidence, and that they focused solely on the expert testimony regarding other injuries as the basis for determining that the confession was reliable. This theory is not viable. Nothing occurred at trial to signal to the members that they should disregard Dr. Arruza's conclusions drawn from her examination of the brain and focus solely on the other injuries for purposes of evaluating the confession. On the contrary, the evidence regarding the brain was the central focus of the Government's case and the Government's arguments on findings.

In the present case, the issue of voluntariness was so close that state judges at both the trial and appellate level determined that appellant's confession was inadmissible. In making our determination as to whether the errors in the present case were harmless beyond a reasonable doubt, it is inappropriate to rely on a theory which requires us to assume that the members, in reaching a decision on reliability, were

19

not substantially influenced by evidence central to the prosecution's case.

The Government bears the burden of demonstrating that the errors in this case did not substantially influence the members' verdict.  United States v. Moolick, 53 MJ 174, 177 (2000).  The possibility that the members ignored the central evidence in the case and convicted appellant based on a theory that was not presented to them is too speculative to uphold a conviction on grounds of harmlessness beyond a reasonable doubt.  In that regard, it is noteworthy that the members rejected the Government's argument that appellant murdered his son, convicting him of a lesser included offense -- involuntary manslaughter -- notwithstanding the brutality described in the confession.[3]  There is a significant possibility that the members placed considerable reliance on Dr. Arruza's testimony to resolve any doubts they had as to the timing of Timmy's fatal head injury.  The Government bears the burden of negating this possibility if the conviction in this case is to be sustained on grounds of harmless error.  Id.  The Government has failed to do so.  In the context of the very close question presented to the

---

[3] Appellant was charged with the unpremeditated murder of his son under one of two theories: (1) murder with intent to kill, or (2) murder by "inflicting great bodily harm," the latter requiring the members to find that appellant engaged in acts which were "inherently dangerous . . . and evinced a wanton disregard for human life, and that [appellant] knew that death or great bodily harm [to his son] was a probable consequence of the act."

20

members as to voluntariness of the confession, and in light of the interlocking nature of the prosecution's evidence and argument on the confession and the expert testimony, the military judge's failure to take appropriate corrective action was not harmless beyond a reasonable doubt.